**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 97-30514

JOHN THOMPSON,

Petitioner-Appellant,

versus

BURL CAIN, Warden,
Louisiana State Penitentiary,
Angola, Louisiana

Respondent-Appellee.

Appeal from the United States District Court
for the Eastern District of Louisiana

October 27, 1998

Before DAVIS, EMILIO M. GARZA and STEWART, Circuit Judges.

STEWART, Circuit Judge:

Louisiana state prisoner John Thompson appeals his first degree murder conviction and death sentence. Specifically, Thompson alleges that at trial: (1) the government withheld critical evidence; (2) the government offered false or misleading testimony; (3) the trial court facilitated the coercion of a hold-out juror; (4) the government used its peremptory strikes to exclude blacks from the jury; (5) the trial court charged the jury with an improper reasonable doubt instruction; and (6) defense

counsel was ineffective during both the guilt and sentencing phases of trial. For the reasons assigned, we AFFIRM the judgment of the district court.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

On May 8, 1985, an Orleans Parish, Louisiana jury convicted John Thompson of first degree murder and sentenced him to death. At trial, the state established that on the morning of December 6, 1984, at around 12:30 a.m., Kevin Freeman was driving home from his sister's house, when Thompson stopped him and requested a ride. Though running low on gasoline, Freeman agreed to give Thompson a ride as the two knew each other, lived in the same neighborhood, and were thus going to the same general destination. Shortly after Thompson entered the car, the vehicle ran out of gasoline. Freeman parked the car on the street and he and Thompson began walking home. Freeman inquired if Thompson had any money. Thompson responded by asking Freeman if he wanted to make some money and stated, "I got the heat with me," presumably to mean that he was carrying a gun. Thompson then reportedly spotted the victim, thirty-four year old Raymond T. Liuzza, Jr., who was returning to his home and had parked his car nearby. Referring to Liuzza, Thompson told Freeman, "I'm going to hit him." Once Liuzza exited the car, Thompson drew his .357 magnum revolver. Freeman watched as Thompson crossed the street, grabbed Liuzza from behind, and threw him to the ground. As Freeman was fleeing the scene, he heard several shots, looked back, and saw Thompson running away.

At about the same time, Pamela Staab—a neighbor of Liuzza's—was awakened by the sound of Liuzza's voice outside her bedroom window. She heard Liuzza offer his watch and wallet to his assailant. She then heard several gunshots. Staab heard nothing to suggest that Liuzza struggled or wrestled with his assailant. At about the same time, another neighbor heard five gunshots and then

2

saw a man fitting Thompson's description fleeing the scene with a gun in his hand. At approximately 12:30 a.m. that morning, Police Officer David Carter received a call dispatching him to the crime scene. Cart er reported that upon his arrival at the scene, he found Liuzza lying on the sidewalk. Liuzza remained conscious until the ambulance arrived to transport him to the hospital. Carter indicated that Liuzza said that he had been robbed by a black male. Liuzza repeatedly asked Carter, "Why did he have to shoot me?" Liuzza died at 2:17 a.m. An autopsy revealed that two of the five gunshot wounds suffered by Liuzza were fatal.

In its investigation, the police discovered that after the incident, Thompson had sold the murder weapon to one Junior Lee Harris. A warrant search of Harris' home led to the discovery of Liuzza's gold pinky ring. Police also learned that Harris had, in turn, sold the murder weapon to Jessie Harrison, from whom the police later recovered it. Bullets recovered from the Liuzza murder scene subsequently were linked to the gun in question. In addition, Thompson later made incriminating statements about the crime to Freeman and government witness Richard "Funk" Perkins, and police recovered a letter in which Thompson had requested the help of an individual named "Big Daddy Red" in concealing his (Thompson's) involvement in the crime. Finally, government witness Kenneth Carr testified that he had overheard a conversation of Thompson's in a bar in which Thompson expressed concern about the reward being offered for information about the Liuzza crime.

On May 8, 1985, Thompson was convicted of first degree murder and sentenced to death. His conviction and sentence were confirmed on direct appeal, State v. Thompson, 516 So.2d 349 (La. 1987), cert. denied, 109 S.Ct. 180 (1988). On February 14, 1989, Thompson filed an application for post-conviction relief with the trial court. This application remained pending for 45 months. Finally,

3

on November 10, 1992, the state trial court denied appellant's application. In December 1992, Thompson filed a writ application with the Louisiana Supreme Court challenging the trial court's judgment. With regard to the writ, the Louisiana Supreme Court denied in part and granted in part. Thompson's case was remanded to the trial court for an evidentiary hearing on appellant's claim that the state knew or should have known that Richard "Funk" Perkins lied at trial about his knowledge of, or the benefit he hoped to derive from, the reward offered by the victim's family and that the state did nothing to correct the witness' testimony disavowing any motive or bias in the case. Thompson's application was denied in all other respects. Pursuant to the Louisiana Supreme Court's remand order, the trial court held an evidentiary hearing on June 23, 1995. The trial court issued writen reasons denying appellant's post-remand application for post-conviction relief on September 19, 1995. Appellant again sought relief from the Louisiana Supreme Court and again was denied in April 1996. Thompson then filed a federal habeas petition. The district court denied his application on February 24, 1997 and his subsequent request for reconsideration on April 17, 1997. Thompson filed a notice of appeal and was granted a certificate of appealability by the district court. Thompson timely appeals his conviction and sentence.

## DISCUSSION

### I

In a habeas corpus appeal, we review the district court's findings of fact for clear error and review its conclusions of law de novo, applying the same standard of review to the state court's decision as the district court. Gochicoa v. Johnson, 118 F.3d 440, 444 (5th Cir. 1997) (citing Spence v. Johnson, 80 F.3d 989, 993 (5th Cir.), cert. denied, --- U.S. ---, 117 S.Ct. 519, 136 L.Ed.2d 407 (1996)). Pursuant to the amendments to 28 U.S.C. §2254 by the Antiterrorism and Effective Death

4

Penalty Act ("AEDPA") Pub.L. No. 104-132, 110 Stat. 1214 (1996), a federal court should not grant relief on any claim adjudicated on the merits by a state court unless the state decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, or if the state court's determination of facts was unreasonable in light of the evidence. AEDPA § 104(3) (codified at 28 U.S.C. § 2254(d)). Because Thompson's petition for federal habeas corpus relief was filed with the district court after AEDPA was signed into law, this court accordingly must afford great deference to state court judgments on federal collateral review pursuant to the statute's amendments. See Gochicoa, 118 F.3d at 444.

## II

Thompson first argues that the government withheld critical evidence in his case. He claims that he requested favorable evidence from the state in presenting his defense; specifically, he alleges that he sought evidence relating to the payment or promise of a reward for information leading to the capture of Liuzza's assailant and that such evidence was withheld from him in violation of the Supreme Court's holding in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Under Brady, the prosecution's action in withholding material evidence favorable to the accused upon request amounts to a violation of due process. Id. at 86-87, 83 S.Ct. at 1196-97. Thompson asserts that it is without dispute that the state had this type of evidence in its possession and failed to produce it, despite the state's affirmative representations to defense counsel that it did not have such information. Thompson insists that the state possessed no fewer than nine specific items of evidence regarding the reward which were favorable to his defense. He alleges that these items included: (1) a police report which revealed that (a) Carr requested the reward from Crime Stoppers, (b) the police originally concluded that Perkins offered information only in the hope of receiving a reward, and ©

5

Perkins met with the Liuzza family representatives who had offered the reward; (2) Crime Stoppers questionnaires from Perkins and Carr; and (3) witness statements from Perkins and Carr indicating their knowledge of and interest in the reward. Thompson implies that Perkins and Carr colluded with the state to hide such information and that such information could have been used by the defense to impeach the testimony of state witnesses Perkins and Carr.

## A

We first turn to Thompson's <u>Brady</u> claims regarding Richard "Funk" Perkins. The record discloses that Perkins testified at trial that he obtained a gun from Thompson that subsequently was identified as the murder weapon, and that Thompson told Perkins that he had accidentally shot Liuzza. Thompson argues that Perkins conspired with the state in order to conceal a Crime Stoppers questionnaire revealing Perkins knowledge of the reward as well as audio tapes of Perkins' meeting with the Liuzza family, in order to appear as a disinterested witness and to disprove any suspicion that he might have a motive to testify falsely.[1] The government contends that such claim can be defeated for at least two reasons: (1) Perkins did not deny knowledge of the reward during his testimony and (2) the audiotapes of Perkins' meeting with the Liuzza representatives and the completion of the Crime Stoppers questionnaire do not support Thompson's claim that Perkins solicited a reward.

As previously noted, <u>Brady</u> requires that upon request the prosecution must disclose to the defense evidence favorable to the accused that, if suppressed would deprive him of a fair trial. <u>Brady</u>, 373 U.S. at 86-87, 83 S.Ct. at 1196-97. Though <u>Brady</u> addressed only exculpatory evidence, this

---

[1]Thompson theorizes that Perkins made arrangements with the Liuzza family to receive a reward in exchange for his testimony at trial. Allegedly, this reward was offered in addition to the Crime Stoppers discussed throughout this opinion. The existence of the arrangement with the Liuzza family has never been established as fact and is not supported by the evidence of record.

6

doctrine has been expanded to include impeachment evidence as well as exculpatory evidence. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). Having reviewed the record, we find that none of the materials that appellant catalogues with relation to Perkins are in and of themselves exculpatory and thus do not fall within the ambit of Brady. Still, we must consider whether such materials were proper impeachment evidence regarding Perkins. In order for such information to be relevant impeachment evidence, it is necessary that knowledge of the reward was concealed from the defense and that Perkins himself denied knowledge of the reward. The record reflects that the defense was aware of the existence of the reward money and that Perkins might be entitled to such funds.[2] Further, the audio tapes do not indicate that Perkins requested a reward or that any member of the Liuzza family promised him a reward. The Crime Stoppers questionnaire does not indicate that Perkins was the caller, or that Perkins received any reward money. Additionally, the record indicates that at no time did Perkins deny knowledge of the reward or that he might be entitled to collect it.[3] Moreover, even if the evidence to which Thompson points were proper impeachment evidence, the prosecution is under no duty to furnish defendant with

---

[2]Defense counsel intimated in his opening statement in Thompson's trial that Perkins was not a credible witness because of his intention to collect the $15,000 reward. The relevant portion of counsel's statement is excerpted as follows:

> The conversation with Richard Perkins—you will have to judge Mr. Perkins's motivation. You will have to judge what Fifteen Thousand Dollars in reward money means to a person, and why he would say somebody did it, . . .

[3]The record demonstrates that Perkins never gave testimony that was contradictory to the evidence in question. Further, defense counsel never asked questions of Perkins that were probative of the reward. In only one limited instance did defense counsel mention the reward in his questioning of Perkins and merely asked "Would it also be a fair statement to say, sir, that Fifteen Thousand Dollars is a lot of money?" to which Perkins responded, "What are you talking about?"

7

information that is readily accessible to the defense. Herrera v. Collins, 954 F.2d 1029 (5th Cir. 1992). Because defense counsel had knowledge of such evidence and could easily have requested access from the prosecution, we conclude that Thompson's Brady allegations against Perkins are without merit.

**B**

We next turn to Thompson's allegations of Brady violations regarding pretrial statements and a Crime Stoppers questionnaire completed by Kenneth Carr. Thompson argues that he was unable to impeach Carr with evidence that Carr intended to apply for, or had collected a reward as a result of his testimony. The government suggests that Carr in no way misled the jury about any possible interest he might have in a reward and that his pretrial statements and Crime Stoppers questionnaire were not discoverable because they were not inconsistent with Carr's trial testimony. The government disputes Thompson's contention that law enforcement officers promised Carr a reward. Indeed, the record indicates that the pretrial evidentiary hearing testimony of Detective Donald Curole, an investigator in this case, indicated that the allegations of a promise of a reward in Carr's affidavit were false. The government again emphasizes that defense counsel is solely at fault for its failure to ask relevant questions of Carr to probe whatever possible biases he may have had as a result of the reward.

A review of the record indicates that at no time did Carr deny knowledge of a reward in his trial testimony. Thompson makes much of the fact that in a pretrial affidavit, Carr indicated that investigating detectives promised him a reward. As the government points out, such an admission, if true, would not amount to exculpatory or impeachment Brady evidence as it does not contradict any testimony offered by Carr at trial. We must agree with the government that defense counsel

8

failed to press the issue of reward money with Carr in his trial testimony. Because there are no inconsistencies between the material that Thompson cites and Carr's testimony, we conclude that no Brady violation occurred.

C

We now turn to Thompson's allegations of Brady violations with regard to the testimony of Kevin Freeman. As stated above, Kevin Freeman was with Thompson on the night of Liuzza's murder and was originally charged as a co-defendant in the crime. Thompson insists that the state did not disclose the favorable "deal" received by Freeman in exchange for his testimony as a government witness. Thompson also suggests that Freeman's trial testimony could have been impeached by both pretrial statements made by Perkins and by information in the police report.

Thompson's assertions with regard to Freeman are easily dismissed. It is clear from the record that Freeman was questioned about the "deal" he was receiving in exchange for his testimony and that he testified truthfully in response. In response to the prosecutor's questions, Freeman stated that as a result of his testimony he would be allowed to plead guilty as an accessory after the fact and receive a five-year sentence. As the government notes, the record also reflects that defense counsel was aware of this deal prior to Freeman's testimony. Because no information regarding Freeman's "deal" was concealed from the defense, we reject Thompson's Brady argument on this point. Additionally, the record demonstrates that Perkins' statements do not differ from Freeman's trial testimony, nor did the police report in any way impeach Freeman's trial testimony. Indeed, we find that such material is consistent with Freeman's trial testimony and thus reject Thompson's Brady claims.

9

# III

In an argument similar to his <u>Brady</u> claims disposed of above, Thompson argues that Perkins and Carr lied at trial about the benefit they hoped to derive from the reward offered by the victim's family. Moreover, Thompson insists that the government knowingly presented such misleading information in violation of <u>Napue v. Illinois</u>, 360 U.S. 264-269-270, 79 S.Ct. 1173, 1176-1178, 3 L.Ed.2d 1217 (1959). Thompson maintains that the district court's conclusion that Perkins was never promised money by anyone prior to trial is contrary to the uncontroverted evidence that was developed in state post-conviction proceedings. Thompson asserts that Perkins testified to the fact that he was told by the prosecutor that he would receive a reward. According to Thompson, Perkins then testified at trial that no one had promised him anything to testify. Likewise, Thompson insists that while Carr also testified at trial that he had not "applied" for a reward by contacting Crime Stoppers, Carr's testimony at the evidentiary hearings indicates that such statements are misleading.

The Supreme Court held that due process is violated when the state knowingly offers false testimony to obtain a conviction and permits that testimony to go uncorrected. <u>Napue</u>, 360 U.S. at 269, 79 S.Ct. at 1177. In applying this doctrine, the Fifth Circuit has held that:

> [f]alse testimony for these purposes includes testimony that affects only the credibility of a witness. <u>Napue</u>, 360 U.S. at 269-270, 79 S.Ct. at 1177. Thus, the grant of a new trial based upon a <u>Napue</u> violation is proper only if (1) the statements in question are shown to be actually false; (2) the prosecution knew that they were false; and (3) the statements were material. <u>United States v. Blackburn</u>, 9 F.3d 353, 357 (5th Cir.1993).

<u>United States v. O'Keefe</u>, 128 F.3d 885, 893 (5th Cir. 1997). The <u>O'Keefe</u> court further noted that the <u>Napue</u> test—and specifically the issue of materiality—involves a mixed question of law and fact,

10

so that the court must undertake an independent appellate analysis to determine whether the facts found by the trial court rise to the level of the applicable legal standard.  Id.

As we held in regard to the Brady claims mentioned above, Thompson's Napue claims are not supported by the record.  There is no evidence from which we may conclude that the testimony in question was actually false.  Thompson's argument with regard to Perkins hinges on the fact that Perkins testified that he was not promised anything in exchange for his testimony.  Thompson insists that the audio tapes of Perkins' meetings with the Liuzza family and the Crime Stoppers report indicate otherwise.  We must reiterate that despite Thompson's protestations, neither piece of evidence indicates that Perkins was promised or even motivated by a reward.  Though Thompson attempts to bolster his argument by noting testimony that indicates Perkins' awareness of a reward, such evidence does not support his contention that Perkins' testimony was actually false.

Thompson makes virtually the same two assertions regarding Kenneth Carr.  He suggests that: (1) Carr lied during trial when he denied having applied for a reward and (2) the state withheld information that Carr had been promised a reward by the state in return for testimony.  Once again, our review of the testimony in question indicates that Carr *admitted* to having applied for the reward during cross-examination.[4]  While the testimony is admittedly somewhat confusing and Carr was in

_____

[4]The relevant testimony is excerpted as follows:

> By Defense Counsel:
> Mr. Carr, my name is Rob Couhig.  We met yesterday, and you're familiar with the fact that Mr. Fanning and I represent John [Thompson], are you not?
> A.      Yep.
> Q.      Tell me about the reward you heard about.
> A.      From who?
> Q.      From whomever you heard about it.
> A.      I didn't hear from anybody no reward.
> Q.      I thought you mentioned something about a Fifteen Thousand Dollar reward.

no way forthcoming about his knowledge, the government's argument that this represents a lapse on the part of defense counsel in failing to clarify Carr's answers through additional questioning is convincing. As for Thompson's assertion that the state withheld information that Carr was promised a reward, we reiterate that Detective Curole's testimony specifically refuted Carr's assertion that he was promised a reward. Though Thompson urges us to dismiss Detective Curole's statement and accept Carr's affidavit as true, we are not persuaded to do so. We find Thompson's argument unconvincing.

**IV**

Alleging error on the part of the trial court, Thompson insists that the court's improper questions regarding the numerical division of the jury during the penalty phase led to the open identification of Leola Chaney as the lone hold-out juror. Thompson insists that Chaney was then forced by the trial judge to continue deliberating though she was visibly distraught and in tears. Ms. Chaney's post-trial affidavit on this subject further emphasizes the nature of the incident as well as her emotional reaction.[5] According to Thompson, such actions individually indicate the trial court's

A.    Yeah, I heard it from the guy over here, talking about it.
Q.    Other than that, you'd never heard of the reward?
A.    No.
Q.    You made application for it?
A.    Oh, I heard it on the news a couple of times. <u>Yeah.</u> [emphasis added.]

[5]Chaney's affidavit, in relevant part, states:

[i]t was a horrible, emotional moment for me, and I began to cry in front of everyone. Some of the jurors had said that if we sentenced Mr. Thompson to life in prison, he might be released some day, and I felt like everyone who was staring at me was blaming me for that. The foreperson actually turned around and whispered to me that it would help to go back in. I knew that everyone was looking at me,

disregard of its responsibility to insulate jurors from coercion and, when taken together, result in coercion that rendered the sentence fundamentally unfair.

The government maintains, and the evidence of record indeed bears out, that no one improperly influenced Ms. Chaney's verdict. After two hours of deliberation over the penalty and having expressed some difficulty reaching unanimity, the jury was brought into the courtroom by the sheriff on duty. Though the jurors offered conflicting opinions as to whether they wished to continue deliberating, the trial judge concluded that the jury was unanimous in its desire to continue deliberating. The record indicates that the trial judge exerted no deliberative pressure, but only attempted to assess the state of the deliberation process.[6]

---

> and I was upset, so I whispered to the foreperson "yes," so that we could get out of there and stop everyone from looking at me.

[6]The following colloquy is excerpted from the trial transcript:

| | |
|---|---|
| By the Court: | Ladies and Gentlemen, have you been able to come to a decision? |
| By a Juror: | No, Your Honor, we have not been able to come to a unanimous decision. |
| By the Court: | Can you tell me this, without saying which way it is, do you have any idea how split the decision is? |
| By a Juror: | Eleven to one. |
| By the Court: | And, do you believe that any further deliberation might result in your ability to reach a decision? |
| By a Juror: | No, Your Honor. |
| By the Court: | I take that to mean, you do not believe that it will. . . . |
| Reporter's Note: | A conference ensued at the bench. |
| By the Court: | Ladies and Gentlemen, just so I do understand this, so that we can be very clear. It's my understanding, from what you said, that you feel that even if you were to go back out now to attempt to deliberate some more, that it would be futile, that there would not be a chance of you reaching a verdict. Would that be correct? |
| By a Juror: | We'd like to go back in. |
| By the Court: | Ladies and Gentlemen, if you would go back in and attempt once again. If after a reasonable amount of time, it still appears that you're not able to, well then, let the sheriff know and we will come back out. |

The standard against which juror coercion is assessed concerns coercive activity on the part of the court, not the deliberative pressure exerted upon a holdout juror by other members of the jury. In her affidavit, Chaney characterized being stared at by fellow jurors and spectators during this exchange as "embarrassing." While any treatment by jurors, whether incidental or consciously designed to bring about such a reaction by Ms. Chaney is unfortunate and regrettable, it is important to note that it in no way stemmed from the court's actions. We thus find that Ms. Chaney's perception does not raise the specter of a constitutional violation. The trial court did not in any way identify Ms. Chaney as a hold-out juror, nor did it force her to continue deliberating.

In Montoya v. Scott, 65 F.3d 405, 412 (5th Cir. 1995), this court addressed a trial court's inquiry into the numerical division of a jury and noted that in a habeas proceeding the question is whether the inquiry and conduct of the trial judge violates due process. The Montoya court carefully considered the bright-line rule established by the Supreme Court in Brasfield v. United States, 272 U.S. 448, 449, 47 S.Ct. 135, 135-36, 71 L.Ed. 345 (1926) that it is reversible error in a federal criminal case for a trial court to inquire how the jury is divided numerically on recall after the jury's failure to agree. The Montoya court stated that "every court of appeals that has addressed the issue has held that Brasfield's per se rule does not apply in the habeas context. . . ." Montoya, 65 F.3d at 412 (internal citations omitted). The Montoya court aligned itself with the Fourth, Sixth, Seventh, Eighth and Ninth Circuits in its holding:

> [w]e agree with those courts that an inquiry into the numerical division of the jury warrants federal habeas relief only if, under the totality of the circumstances, the inquiry, coupled with a subsequent charge, rendered the petitioner's trial fundamentally unfair.

> . . .

14

<u>Id.</u> (internal citations omitted).

In this case, we conclude that the trial judge's inquiry into the numerical division did not render Thompson's trial fundamentally unfair. The judge inquired simply to assess the progress of the jury. Again, the record indicates that no pressure was placed on Ms. Chaney or any of the other jury members by the judge himself. Jury deliberations in a capital case are typically anxiety producing. The jury in this case had deliberated for only two hours in an attempt to determine Thompson's fate. Because at least some of the jurors expressed a desire to continue deliberations, the trial judge sent them back to the jury room. Two hours is a relatively brief time for deliberations in a case of this nature and we do not find it unreasonable that the judge directed the jury to continue its deliberations toward reaching unanimity given the limited time for which they had met. We do not find that any of these actions was coercive or fundamentally unfair.

## V

Thompson asserts that the district court erred in concluding that he had not established a prima facie case of racial discrimination regarding the prosecution's use of peremptory strikes under <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d. 69 (1986). Specifically, Thompson suggests that the make-up of the jury in his trial, which was only 33% African-American, is strong evidence of discriminatory motive. Further, he argues that the evidence presented by the defense statistician, Dr. Siskin, conclusively proves that the prosecutor used race as a factor to exclude African-Americans from the jury. The district court concluded that there was no <u>Batson</u> violation because the state: (1) allowed four African-Americans to be selected as jurors; (2) did not challenge three African-Americans struck by the defense; and (3) did not make any statements during voir dire to support an inference of discrimination.

15

A prosecutor violates the Equal Protection Clause by challenging potential jurors solely on the basis of their race. Id. at 89, 106 S.Ct. at 1719. The process for evaluating an objection under Batson requires that (1) a defendant make a prima facie showing that the prosecutor has exercised his peremptory challenges on the basis of race, (2) the burden then shifts to the prosecutor to articulate a race-neutral reason for excusing the juror in question, and (3) the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. Id. at 96-98, 106 S.Ct. at 1723-24; United States v. Clemons, 941 F.2d 321, 324 (5th Cir. 1991). Federal habeas review of a state conviction requires a reviewing federal court to accord a presumption of correctness to the state court's factual findings, and demands that the presumption be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

In evaluating Thompson's claim, the district court concluded that Thompson did not present clear and convincing evidence that the factual conclusions of the Louisiana Supreme Court were incorrect. We agree with the district court. Further, we note that on appeal, Thompson does not substantiate his claims that the state struck potential jurors because of their race, as is required to establish a prima facie Batson violation.

During the trial of the instant matter, defense counsel moved for an evidentiary hearing after the state exercised its first five peremptory challenges, all against African-Americans. The trial judge, noting that of the eleven jurors selected, seven were white and four were African-American, denied the request. Defense counsel requested a mistrial and such request was denied. The trial court, having determined that the defense had not made a "particularized showing" under Swain v. Alabama, 380 U.S. 202, 205, 85 S.Ct. 824, 827-828, 13 L.Ed.2d 759 (1965)—the prevailing law at the time—did not require the state to articulate reasons for its use of the peremptory challenges. After

16

the jury had been instructed during the penalty phase, however, the state elected to read into the record its race-neutral reasons for each of the peremptory challenges. While Thompson's direct appeal to the Louisiana Supreme Court was pending, Batson was handed down and given retroactive application to all cases pending on direct review or not yet final. The Louisiana Supreme Court concluded, and the district court affirmed, that defendant failed to make a prima facie Batson showing and that the state did not use its peremptory challenges with a discriminatory purpose. Because Thompson has not met his burden of presenting clear and convincing evidence to rebut this conclusion, we affirm the decision of the district court.

## VI

Thompson urges that the reasonable doubt instruction given at his trial was constitutionally defective pursuant to Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). According to Thompson, the trial court offered the jury the definition of reasonable doubt as a doubt "founded upon a real, tangible, substantial basis, and not upon mere caprice, fancy or conjecture. It must be such a doubt as would give rise to a grave uncertainty raised in your mind by the unsatisfactory character of the evidence." While conceding that the instruction did not contain all of the offending elements of the instruction held to be unconstitutional in Cage, Thompson nonetheless asserts that there is a reasonable likelihood that the jury understood the instruction to allow conviction based on proof insufficient to meet the proper standard.

The government acknowledges that the instruction from Thompson's trial was arguably similar to the instruction in Cage, but not "remarkably similar" to the Cage instruction as Thompson claims. More importantly, notes the government, the instruction that Thompson challenges is *exactly* the same as the instruction found constitutionally sufficient by this court in Brown v. Cain, 104 F.3d

17

744, 754 n. 4 (5th Cir. 1997). The record supports the government's assertion that such instruction specified "beyond a reasonable doubt" no fewer than seven times. Further, the government notes that even if this court does not reject Thompson's argument that the instruction fails on constitutional grounds, it must decline to consider the claim because Cage cannot be applied retroactively. The government suggests that following this court's reasoning in Brown, Thompson's Cage claim should be rejected as improperly before the court on collateral review since Thompson's conviction became final in 1987—before Cage was announced.

In Cage v. Louisiana, the Supreme Court held that a jury instruction equating reasonable doubt with a "grave uncertainty," an "actual substantial doubt," and a "moral certainty," understood together in the context of the charge as a whole, suggested a higher degree of doubt than the reasonable doubt standard requires. Cage, 498 U.S. at 40; 111 S.Ct. at 329. The charge in Cage was thus found to be a violation of the Due Process Clause of the Fourteenth Amendment.

The Cage Court emphasized that in analyzing such instructions a court should consider how reasonable jurors would have understood the charge as a whole. However, the standard of review applied by the Supreme court in Cage has been modified by the Court's decision in Estelle v. McGuire, 502 U.S. 62, 1125 S.Ct. 475, 116 L.Ed.2d 385 (1991). We determine whether there is a reasonable likelihood that the jury did apply the instruction unconstitutionally. Having carefully reviewed the record we conclude that there is no reasonable likelihood that the jury applied the challenged instruction in an unconstitutional manner.

**VII**

Lastly, Thompson contends that he was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution. He asserts that his

18

attorneys (1) failed to engage in meaningful advocacy in his closing argument at the penalty phase of the trial; (2) failed to have petitioner evaluated by a psychiatrist and failed to present mitigating evidence; and (3) were ineffective at the guilt phase of trial. Most notably, Thompson insists that in closing arguments of the penalty phase, his counsel "utterly abandoned" him and acted in a manner that made clear to the jury he did not identify with Thompson.[7]   Thompson challenges his attorneys' failure to present Thompson's grandmother to testify and ask the jury to save her grandson's life. Finally, with regard to the guilt phase of trial, Thompson argues that his counselors failed to challenge ballistics evidence and failed to introduce eyewitness testimony about the gunman who fled the scene as well as testimony regarding Thompson's own physical appearance on the night in question.[8] Thompson insists that such testimony would exonerate him of the crime.

The government argues that the conduct of Thompson's attorneys reflects entirely reasonable and tactical legal choices. With regard to defense counsel's closing argument, the government contends that it was animated and effusive, and that Thompson again has failed to identify error or prejudice to support his claim. In an effort to protect their client, the government urges, Thompson's attorneys did not run the risk of compounding the evidence against him by presenting ballistics

---

[7]In particular, Thompson challenges the following statements made by defense counsel during portions of his closing argument: (1) "[Opposing counsel] indicated to you that I was going to get up, and try to lay a guild trip on you if you choose to recommend to the court that the death penalty be imposed in this case. Well, I'm going to tell you now, that I have no such intention. This is your decision to make[.]" (2) "We're court appointed counsel, and we came in, and whatever somebody might say in the future about the case we tried, we tried[.]" and (3) "I don't think anyone outside of the family members feels any worse about Ray Liuzza getting killed than I do. It's an awful, horrible thing. . . ."

[8]Thompson maintains that he had long hair on the night of the murder and that an eyewitness testified at trial that the person he saw fleeing the murder scene had short hair. The record demonstrates that the eyewitness testified that the alleged perpetrator had a short afro that was pulled back and not fully picked out.

evidence, having independent tests run on the murder weapon, or submit non-contradictory evidence about Thompson's physical appearance. The government also notes that the defense counselors did, in fact, elicit testimony in an attempt to benefit his client with regard to the physical description of the assailant on the scene. The government suggests that Thompson has not established either (1) the requisite attorney error; or (2) the resulting prejudice, both of which are required for proving ineffective assistance of counsel and having his death sentence reversed under Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 2064-65, 80 L.Ed.2d 674 (1984).

Under Strickland, reviewing courts must grant attorneys' decisions a presumption of reasonability. Id. at 688-90, 104 S.Ct. at 2064-66. Further, we must recognize that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690, 104 S.Ct. at 2066. Based on our review of the evidence of record, we find that both of Thompson's attorneys' tactical choices during trial were reasonable under the circumstances. In the challenged closing argument, counsel made a plea for Thompson's life, referred to the mitigating evidence, and reminded the jurors that they were the ultimate decision-makers regarding this charge. We do not find that there was attorney error.

We now turn to Thompson's challenge that he received ineffective assistance because of the failure to have him (Thompson) evaluated by a psychiatrist or to present mitigating circumstances. We note that there is no evidence in the record to suggest that Thompson ever suffered from a mental defect of any type. Under different circumstances, we have held that a defendant exhibiting significant evidence of mental defect warranted a psychiatric evaluation. Loyd v. Whitley, 977 F.2d 149, 156-57 (5th Cir. 1992). In Loyd, because the defendant's sanity was a critical issue of which counsel was aware, we held counsel's failure to present such evidence was error. Id. Because

20

Thompson's mental stability was never in question, there appears to have been no cause for defense counsel to present psychiatric testimony regarding any possible mental impairment.

Addressing Thompson's challenge that no mitigating evidence was presented, we find that the testimony of the defense's sociologist, Dr. Morse (which Thompson now challenges), to the effect that Thompson was a victim of circumstances, was proper mitigating evidence. Through defense counsel's questioning, Morse thoroughly explored the history of abuse and personal hardships in Thompson's background.[9] Though Thompson maintains that the witness was improperly prepared, it is difficult to ascertain what more telling or helpful information counsel could have elicited from

[9]The relevant portion of the trial transcript reads as follows:

> By [Defense Counsel]:
> Q.  First, Dr. Morse, . . . based on what you knew, did you find, from your expertise, any predictable factors to look for in John [Thompson]?
> A.  [Sic] [w]ould expect that John would have very little education in interviewing him, . . . He was only fifteen or sixteen himself when he has [sic] children. He has a very poor job history. He's in or out of work. He's had many brushes with the law, and had problems. He's been socialized in the streets primarily, and having been socialized in the streets, has grown up quite tough. He's learned that the answer to being a man is to stand firm, and not move. He's learned that if he's going to survive without parental guidance, or the parenting behaviors that we normally expect in the working class, middle class, or upper class children, that being missing for so many years, it ends up in fact that John is socialized not primarily by his parents, but rather socialized by older children, older persons in the streets.
> Q.  Dr. Morse, did you expect to find, or did you find that John Thompson has the same set of values that you or I, or any other middle class person would have?
> A.  To the extent that John would like to have his child, and be good to his child, and care about his child, and care about his girl friend, and live with her, yes. Beyond that, his world is defined as a world in which basically you would define it as criminal. . . . He dealt marijuana, and something called clickum, or rather dangerous drugs. That's how he made his living. He's been in jail, the same as his father. He's been repeatedly in jail. . . . The communality of father and son coming parallel to each other, particularly, as it would relate to this individual would not be unexpected.

21

a witness in these difficult circumstances. The evidence indicates that counsel questioned Morse about Thompson's background in order to establish that Thompson was not entirely responsible for his actions and that his life should be spared.

Thompson alleges that counsel failed to render constitutionally adequate representation at the guilt phase of his trial by failing to challenge or question the prosecution's ballistic evidence. It appears from the record that the prosecution presented strong ballistics evidence and that defense counsel was faced with the difficult task of refuting such evidence.[10] Defense counselors made a strategic decision not to run the risk of compounding such evidence against their client. We do not find such decision to amount to attorney error and we therefore reject Thompson's claims.

## CONCLUSION

In conclusion, Thompson has failed to establish that his conviction and sentence are unconstitutional. His various claims have been fully and fairly adjudicated both in the Louisiana state courts and by the district court below. Thompson's petition for habeas corpus relief under 28 U.S.C. §2254 therefore fails. We AFFIRM the judgment of the district court.

---

[10]New Orleans Police ballistics expert Otto Tubbs testified that based upon tests he had performed, the pellets (or bullets) recovered from the murder scene were indeed fired from the weapon linked to Thompson. Thompson suggests that such tests could have been incorrect, and argues that his attorneys' failure to have the weapon and bullets independently tested amounted to ineffective assistance of counsel.