IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 26, 2008

Charles R. Fulbruge III
Clerk

No. 03-11137

CHARLES E. MINES, JR.

Petitioner-Appellant

v.

NATHANIEL QUARTERMAN, Director, Texas Department of Criminal
Justice, Correctional Institutions Division

Respondent-Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:00-CV-2044-H

Before BARKSDALE, GARZA, and DENNIS, Circuit Judges.

PER CURIAM:[*]

Petitioner, Charles E. Mines, Jr., filed a petition for writ of habeas corpus

pursuant to 28 U.S.C. § 2254. Mines is an inmate in the custody of the Texas

Department of Criminal Justice, Institutional Division, of which Respondent is

the director.

Mines was convicted of capital murder by a jury and sentenced to death

by lethal injection. The Texas Court of Criminal Appeals ("TCCA") affirmed his

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

sentence and conviction. See Mines v. Texas, 852 S.W.2d 941 (Tex. Crim. App. 1992). The United States Supreme Court granted his petition for certiorari and remanded the case to the TCCA for reconsideration in light of its opinion in Johnson v. Texas, 509 U.S. 350 (1993). See Mines v. Texas, 510 U.S. 802 (1993). On remand, his conviction and sentence were again affirmed. See Mines v. Texas, 888 S.W.2d 816 (Tex. Crim. App. 1994), cert. denied, 514 U.S. 1117 (1995). Mines's state application for a writ of habeas corpus was denied by the TCCA. See Ex parte Mines, 26 S.W.3d 910 (Tex. Crim. App. 2000).

Mines filed his initial § 2254 petition for a writ of habeas on December 21, 2000, and an amended petition on April 20, 2001. Respondent answered on June 18, 2001, and furnished the state records. A United States magistrate judge recommended dismissal or denial of all Mines's claims, and the district court adopted the magistrate's findings, conclusions, and recommendations. See Mines v. Cockrell, 2003 WL 21982190 (N.D. Tex 2003). The district court also denied Mines's petition for writ of habeas corpus, dismissing the petition with prejudice. Mines filed a notice of appeal. Subsequently, the magistrate judge recommended that a Certificate of Appealability ("COA") should be denied and the district court adopted this recommendation, entering an order that denied Mines's request for a COA.

Mines petitioned this court for a COA on four grounds, and we granted a COA for two of them: (1) whether Mines's Fifth and Fourteenth Amendment rights were violated by Dr. Grigson's testimony regarding Mines's demeanor in invoking his rights and remaining silent when Dr. Grigson attempted to evaluate Mines; and (2) whether the Texas special issues sentencing scheme precluded the jury from giving effect to Mines's mitigating evidence of mental illness. See Mines v. Dretke, 118 F. App'x 806 (5th Cir. 2004).

The court originally scheduled oral argument on the merits of these two issues for August 31, 2005, but the case was continued due to Hurricane

Katrina. Having now heard argument, we DENY Mines's petition on the ground that Dr. Grigson's testimony constituted harmless error but GRANT the petition on the ground that the Texas special issues sentencing scheme precluded the jury from giving effect to his mitigating evidence of mental illness.

## BACKGROUND

On the afternoon of May 27, 1988, Mines broke into a home occupied by eighty-year-old Vivian Moreno and her invalid daughter, Frances. Upon encountering the women, Mines brutally attacked them with a claw hammer. Vivian was killed instantly, but Frances survived Mines's attack.

Three days later, police apprehended Mines. Within hours of his arrest, Mines confessed to the crime and was charged with the capital murder of Vivian and the attempted capital murder of Frances. Mines pleaded not guilty by reason of insanity to both charges, and he requested a hearing in state court to determine his competence to stand trial.

In support of his request for a competency hearing, Mines produced the testimony of a psychiatric expert, Dr. Schack, and his medical records. Those records indicated that the State had attempted to civilly commit Mines to the custody of a mental hospital approximately a week prior to Vivian Moreno's murder. Following a five-day observation period, the treating physician at the state mental hospital, Dr. Nguyen, determined that Mines was not mentally ill and concluded that Mines should not be committed to the hospital involuntarily. But Dr. Nguyen concluded that Mines did have "a mixed personality disorder with paranoia, passive, aggressive, anti-social features." The state trial court granted Mines's request for a competency hearing, and the issue of Mines's competency to stand trial was presented to a jury.

Mines's primary evidence of his incompetence to stand trial was the testimony of Dr. Schack, Mines's medical records, and the State's attempt to civilly commit him to the state mental hospital. Dr. Schack testified that he had

difficulty in getting Mines to cooperate during his attempts to interview Mines. Dr. Schack also testified that much of his diagnosis was based on his observation of Mines on several occasions as well as review of Mines's medical records. Dr. Schack conceded that it is not uncommon for criminal defendants to simulate symptoms of a mental disorder in an attempt to avoid liability for their crimes. Despite this concession, however, Dr. Schack unequivocally testified that in his opinion Mines's symptoms of mental illness were genuine and that he was incompetent to stand trial for capital murder.

In rebuttal, the State offered expert testimony of: (1) Dr. Grigson, a forensic psychologist; (2) Dr. Nguyen, who had observed Mines while he was at the state mental hospital; and (3) several of Mines's jailers. The jailers testified that Mines was capable of having normal conversations and that Mines appeared to be a fairly intelligent self-educated person who seemed to understand that he had certain rights in jail. The jailers also testified that Mines appeared to understand that he was in jail, why he was in jail, and that when Mines wanted to get along with the jailers and inmates, he could. The jailers testified, however, that Mines could become extremely agitated at other times, and consequently, Mines was confined in a cell by himself.

Dr. Grigson testified that Mines refused to talk to him after Dr. Grigson advised Mines of his right to refuse the examination; that Mines appeared to understand this right; and that his opinion of Mines's competency to stand trial was based entirely upon Mines's medical records and Dr. Grigson's limited observances of Mines before and during the competency hearing. Dr. Grigson testified that he believed that Mines was competent to stand trial and that Mines's seeming irrational behavior was "very deliberate and intentional." Dr. Grigson also mentioned briefly that it was not uncommon for criminal defendants to simulate mental illnesses in an attempt to avoid liability for their crimes.

Mines's counsel vigorously cross-examined Dr. Grigson and elicited testimony that the doctor testified so often and effectively for the State in death penalty cases that he was called "Dr. Death" by the media. Dr. Grigson also conceded that he had spent little more than three minutes speaking to Mines and that his practice of using forensic psychology to predict future dangerousness was looked upon with disfavor by the American Psychiatric Association.

Dr. Nguyen testified that after observing and interacting with Mines over a five day period, he, and the rest of the treatment staff at the mental hospital, concluded that Mines was not incompetent. Instead, Dr. Nguyen believed that Mines had a mixed personality disorder and that Mines was capable of understanding his actions. Dr. Nguyen also testified that Mines could be uncooperative at times and that Mines was "selective in choosing who he talked to." On cross-examination, Dr. Nguyen conceded that he had more patients in his care than he would have preferred at the time he first saw Mines and that it was his decision not to civilly commit Mines.

The jury concluded that Mines was competent to stand trial for the capital murder of Vivian Moreno and the attempted capital murder of her daughter, Frances. Substantially the same expert testimony that was presented during the competency hearing was presented during the murder trial. Though the State presented evidence relating to the crime scene and the conditions of Vivian and Frances Moreno when they were found, approximately 40 percent of the testimony heard by the jury during the murder trial was the testimony of Drs. Schack, Grigson, and Nguyen.

Ultimately, the jury rejected Mines's insanity defense and convicted him of both capital murder and attempted capital murder. After the jury answered all three of the special issues in the affirmative, the state trial court sentenced Mines to death.

## STANDARD OF REVIEW

"In a habeas corpus appeal, we review the district court's findings of fact for clear error and review its conclusions of law de novo, applying the same standard of review to the state court's decision as the district court." Coble v. Quarterman, 496 F.3d 430, 434-35 (5th Cir. 2007) (quoting Thompson v. Cain, 161 F.3d 802, 805 (5th Cir. 1998)).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governed the district court's federal habeas review because Mines filed his federal habeas petition after AEDPA's effective date. See id. at 435. AEDPA makes habeas relief unavailable to a state prisoner for any claim adjudicated on the merits in state court proceedings unless the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court, or (2) resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d).

"Under AEDPA, our duty is to determine whether the state court's determination was contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court at the time that [Mines's] conviction became final." Nelson v. Quarterman, 472 F.3d 287, 293 (5th Cir. 2006) (en banc) (citing Williams v. Taylor, 529 U.S. 362, 405 (2000)). A state court decision is contrary to clearly established Supreme Court precedent if: (1) "the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or (2) "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." Williams, 529 U.S. at 405-06. A state court decision is an unreasonable application of clearly established Supreme Court precedent if the state court

"correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Id. at 407-08.

DISCUSSION

A. Dr. Grigson's Testimony

Mines contends that his Fifth and Fourteenth Amendment rights were violated by Dr. Grigson's testimony regarding Mines's demeanor in invoking his rights and remaining silent when Dr. Grigson attempted to evaluate Mines. At trial, though, Mines offered no contemporaneous objection to Dr. Grigson's testimony, and the district court adopted the magistrate judge's recommendation to deny this claim on the basis of harmless error even though the magistrate judge found that it was a "close call" as to whether the admission of this testimony was contrary to the Supreme Court's teaching in Wainright v. Greenfield,[1] 474 U.S. 284 (1986).

We agree with the magistrate judge that it is a "close call" whether the admission of Dr. Grigson's testimony was a violation of Mines's rights, but we also agree that the error, if any, in admitting this testimony was harmless under Brecht v. Abrahamson, 507 U.S. 619 (1993).[2] Specifically, the comment by Dr. Grigson was only a small part of his testimony and was not the sole or even a major basis for Dr. Grigson's conclusion that Mines was sane at the time of his offense. Moreover, testimony by the other prosecution expert, Dr. Nguyen, and indeed Mines's own expert, Dr. Schack, established that criminal defendants have both the incentive and propensity to simulate mental illnesses in an attempt to avoid responsibility for their actions. Thus, it is unlikely that Dr.

---

[1] In Greenfield, the Supreme Court held that a defendant's invocation of silence may not be used as substantive evidence of his guilt or sanity.

[2] Because any error here was harmless, we need not reach the issue of whether Mines's failure to offer a contemporaneous objection to Dr. Grigson's testimony constitutes a procedural bar.

Grigson's improvident comment regarding Mines's silence had any substantial or injurious effect or influence on the jury's guilty verdict in this case. Accordingly, we affirm the district court's denial of habeas relief on this claim.

B. Texas Special Issues

Mines also claims that the Texas special issues sentencing scheme precluded the jury from giving effect to his mitigating evidence of mental illness. Specifically, Mines argues that the special issue interrogatories in the Texas capital sentencing instruction, as applied to his case, precluded effective presentation of mitigating evidence in violation of the mandates of Penry v. Lynaugh, 492 U.S. 302 (1989) ("Penry I"), and Penry v. Johnson, 532 U.S. 782 (2001) ("Penry II"). Mines stood trial just a few weeks before the Supreme Court's decision in Penry I, and his jury received the same special issue interrogatories considered in Penry I.

In Penry I, the Supreme Court held that the first two "special issue" interrogatories in the Texas capital sentencing instructions, though facially valid, failed to satisfy the constitutional requirement that a capital defendant be able to present and have the jury give effect to mitigating evidence in certain situations. After Penry I, Texas trial courts continued to send the same special issue interrogatories to the jury, but added a supplemental instruction to "cure" any possible Penry I defect.

In Penry II, the Supreme Court again considered a constitutional challenge by Penry. It considered the supplemental instruction given in Penry's retrial, and held that the instruction failed to give Penry's jurors a "vehicle" by which they might give effect to his mitigating evidence. Specifically, the Court held that the supplemental instruction potentially created an unacceptable dilemma for the jurors: Because it instructed the jurors to change one of their truthful "Yes" special issue answers to an untruthful "No" if they felt the defendant did not deserve the death penalty, it left the jurors with the choice of either not

8

giving effect to Penry's proffered mitigation evidence or, alternatively, violating their oaths as jurors.

Mines's claim is that because his jury instructions were virtually identical to the ones given in Penry's trial those instructions created the same situation that the Supreme Court found constitutionally unacceptable in both Penry I and Penry II . Moreover, Mines argues that both the federal and state courts considering this claim have relied on an analytical model that has been recently invalidated by the Supreme Court, thereby creating some doubt as to whether his Penry claim was resolved correctly. We agree for reasons similar to those articulated in Coble, 496 F.3d at 430.

As we noted in Coble, recent Supreme Court cases have restated the clearly established law and prescribed a two-step process for evaluating Penry claims:

> In order to grant relief on [Mines's] Penry claim, we must first determine whether his mitigating evidence of mental illness . . . satisfied the "low threshold for relevance" articulated by the Supreme Court. Tennard v. Dretke, 542 U.S. 274 (2004). If so, we must determine whether there was a reasonable likelihood that the jury applied the special issues in a manner that precluded it from giving meaningful consideration and effect to all of [Mines's] mitigating evidence. See Abdul-Kabir v. Quarterman, 127 S. Ct. 1654, 1664, 1668 n. 14 (2007); Brewer v. Quarterman, 127 S. Ct. 1706, 1710, 1713 (2007); Nelson, 472 F.3d at 293, 315-16.

Coble, 496 F.3d at 444. In Tennard, the Court held that "a State cannot preclude the sentencer from considering 'any relevant mitigating evidence,'" and set the "low threshold" for relevant mitigating evidence as "evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value" or "could reasonably find . . . warrants a sentence less than death." Tennard, 542 U.S. at 284-85. In turn, the

Abdul-Kabir Court then held that "sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence" and that "when the defendant's evidence may have meaningful relevance to the defendant's moral culpability 'beyond the scope of the special issues,' " a special instruction is required. Abdul-Kabir, 127 S. Ct. at 1664, 1668 n.14.

Applying these standards in Coble, this court granted a habeas petition because we found "a reasonable likelihood that the Texas special issues precluded the jury from giving meaningful consideration and effect to Coble's mitigating evidence." Id. at 433. We find the same in regard to Mines's mitigating evidence.[3] Mines's jury instructions were virtually identical to those given to the juries in the trials of Penry and to Coble. Coble introduced evidence of mental disorders, including bipolar disorder, that this court found to constitute relevant mitigating evidence. Id. at 447-48. Mines introduced similar mitigating evidence of bipolar disorder. Just as the Coble court found Coble's mitigating evidence to have "meaningful mitigation relevance beyond the scope of the two special issues, such that a special instruction was required," id., so we find the same for Mines. Thus, just as in Coble, we find that here "there is a reasonable likelihood that the [] jury was precluded from giving full effect to [Mines's] mitigating evidence, [and] we hold that the TCCA's determination to the contrary was an unreasonable application of clearly established federal law as determined by the Supreme Court." Id. at 447.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of habeas relief on Mines's Fifth and Fourteenth Amendment claims regarding Dr.

---

[3] At oral argument the Respondent conceded as much, noting both that Coble controls and that there is no principled way to distinguish Mines's case from Coble. Further, Respondent conceded that our precedent in Nelson, 472 F.3d at 287, forecloses any argument that a Penry error can be subject to harmless error review.

Grigson's testimony, but we REVERSE the district court's denial of habeas relief on Mines's claim that the Texas special issues scheme precluded the jury from giving consideration and effect to his mitigating evidence of mental illness. Accordingly, we REMAND the case to the district court with instructions to grant a writ of habeas corpus based on Mines's special issues claim consistent with this opinion and remand the matter to state court for a new trial on sentencing.