# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 28, 2009

Charles R. Fulbruge III
Clerk

No. 08-70012

GERALD CORNELIUS ELDRIDGE,

Petitioner–Appellant,

v.

NATHANIEL QUARTERMAN, Director, Texas Department of Criminal
Justice, Correctional Institutions Division,

Respondent–Appellee.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:05-CV-1847

Before STEWART, OWEN, and SOUTHWICK, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:[*]

Petitioner Gerald Eldridge seeks a certificate of appealability (COA) on the issue of whether Eldridge is mentally retarded and thus ineligible for the death penalty under *Atkins v. Virginia*.[1] We deny his request for a COA.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] 536 U.S. 304 (2002).

# I

In April 1994, Eldridge was convicted of capital murder and sentenced to death for killing Cynthia Bogany and her nine-year-old daughter, Chirissa. Cynthia Bogany was Eldridge's former girlfriend and the mother of his seven-year-old son, Terrell.

The evidence established that Eldridge went to Cynthia Bogany's apartment, kicked in the door, and shot Chirissa between the eyes at point-blank range, killing her instantly. Eldridge then shot at close range his son Terrell and another individual, Wayne Dotson, both of whom were wounded but survived. Cynthia fled the apartment but Eldridge chased and caught her when she tripped and fell on the stairs outside a neighbor's apartment. Despite Cynthia's pleas for her life, Eldridge shot her twice in the head, killing her instantly. Eldridge was twenty-eight years old at the time of the murders.

The Texas Court of Criminal Appeals (TCCA) affirmed Eldridge's conviction and sentence. Eldridge's initial state habeas corpus application was pending when the Supreme Court of the United States decided *Atkins*.[2] Thereafter, while his first habeas application was still pending, Eldridge filed a second state habeas petition raising an *Atkins* claim.

The TCCA denied Eldridge's initial habeas application and, on the same day, dismissed Eldridge's second application as an abuse of the writ, stating, "We have reviewed the facts applicant presents in his '*Atkins* claim' and find that, even if they were true, he has not established a *prima facie* claim as set forth by this Court in [*Ex parte*] *Briseno* [135 S.W.3d 1 (Tex. Crim. App. 2004)]."

Eldridge filed a skeletal petition for a writ of habeas corpus in federal district court. Eldridge later filed an amended petition raising only one claim

---

[2] *Id.*

for relief: that the Eighth Amendment prohibits Eldridge's execution because he is mentally retarded.

The respondent, Nathaniel Quarterman, Director of the Texas Department of Criminal Justice (TDCJ) Correctional Institutions Division, moved for summary judgment, asserting that the evidence failed to support Eldridge's claim. Both sides filed extensive briefs and exhibits, including grades and standardized-test records from Eldridge's school years, testing performed by the prison system, and testing performed by experts retained for this litigation. The district court conducted a four-day evidentiary hearing at which Eldridge and the TDCJ presented testimony from mental-health experts and from family members, friends, and others who knew or had observed Eldridge.

After carefully considering the petition, summary judgment motion, state-court record, party submissions, evidence presented, and applicable law, the district court granted respondent's motion for summary judgment and denied Eldridge's petition for a writ of habeas corpus. The district court also denied Eldridge's request for a COA. Eldridge now petitions this court for the grant of a COA.

## II

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a petitioner must secure a COA to appeal a federal district court's denial of habeas relief.[3] A COA will be granted only if the petitioner makes "a substantial showing of the denial of a constitutional right."[4] This court conducts a "threshold inquiry" and must issue a COA if "reasonable jurists would find the

---

[3] 28 U.S.C. § 2253(c).

[4] *Id.* § 2253(c)(2).

district court's assessment of the constitutional claims debatable or wrong."[5] "In death penalty cases, any doubts as to whether the COA should issue are resolved in favor of the petitioner."[6] We do "not grant relief on any claim adjudicated on the merits by a state court unless the state decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, or if the state court's determination of facts was unreasonable in light of the evidence."[7]

The state court dismissed Eldridge's *Atkins* claim as an abuse of the writ because Eldridge had not alleged sufficient facts to establish a prima facie case.[8] This court has previously noted that such a dismissal in Texas is a decision on the merits.[9] Therefore, AEDPA's deferential standard of review applies.[10]

## III

The Supreme Court in *Atkins v. Virginia* held that the Eighth Amendment forbids the execution of the mentally retarded.[11] The Court left "to the States the task of developing appropriate ways to enforce the constitutional restriction

---

[5] *Miller-El v. Cockrell*, 537 U.S. 322, 336, 338 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 482, 484 (2000)).

[6] *Gomez v. Quarterman*, 529 F.3d 322, 326 (5th Cir. 2008).

[7] *Id.* (quoting *Thompson v. Cain*, 161 F.3d 802, 805 (5th Cir. 1998)).

[8] *See* TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5 (Vernon Supp. 2008) (providing that a successive state habeas corpus petition may not be considered unless the petitioner alleges specific facts establishing a constitutional violation); *Ex parte Staley*, 160 S.W.3d 56, 63 (Tex. Crim. App. 2005).

[9] *See Rivera v. Quarterman*, 505 F.3d 349, 359 (5th Cir. 2007) ("[T]o decide whether an *Atkins* claim is an abuse of the writ, the CCA examines the substance of the claim to see if it establishes a prima facie case of retardation, and only upon deciding that question can the state court decide whether remand is appropriate.").

[10] *Brown v. Dretke*, 419 F.3d 365, 371 (5th Cir. 2005).

[11] 536 U.S. 304, 321 (2002).

upon its execution of sentences."[12]  Because the Supreme Court declined to explicitly define "mental retardation" for purposes of the Eighth Amendment, Texas courts have employed the definition promulgated by the American Association of Mental Retardation.[13]  This definition imposes three requirements: (1) significantly subaverage general intellectual functioning, generally defined as an IQ below 70; (2) related "limitations in adaptive functioning," defined as "significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group, as determined by clinical assessment and, usually, standardized scales"; and (3) onset prior to the age of 18.[14]  Determination of whether Eldridge satisfies any of these elements is a question of fact.[15]

In a habeas proceeding, we review the district court's findings of fact for clear error and conclusions of law de novo, applying the same standard of review to the state court's decision as the district court.[16]  "A finding is clearly erroneous only if it is implausible in the light of the record considered as a whole."[17]

---

[12]  *Id.* at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 416-17 (1986)).

[13]  *In re Hearn*, 418 F.3d 444, 446 (5th Cir. 2005).

[14]  *Ex parte Briseno*, 135 S.W.3d 1, 7 & nn.24-25 (Tex. Crim. App. 2004) (citing American Association of Mental Retardation, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORT 5 (9th ed. 1992)).

[15]  *See Rivera v. Quarterman*, 505 F.3d 349, 361-63 (5th Cir. 2007) (holding that the district court did not clearly err in finding that defendant suffered from significantly subaverage intellectual functioning and related limitations in adaptive functioning); *see also Briseno*, 135 S.W.3d at 9 ("[T]he ultimate issue of whether [a] person is, in fact, mentally retarded for purposes of the Eighth Amendment ban on excessive punishment is one for the finder of fact, based upon all of the evidence and determinations of credibility.").

[16]  *Thompson v. Cain*, 161 F.3d 802, 805 (5th Cir. 1998).

[17]  *St. Aubin v. Quarterman*, 470 F.3d 1096, 1101 (5th Cir. 2006).

**IV**

The district court found that Eldridge did not have substandard intelligence. Eldridge's IQ test results are consistent with such a finding.

In 1994, Eldridge scored a full-scale IQ of 112 on a version of the Wechsler Adult Intelligence Scale (WAIS) administered by a supervisor of psychiatric services at the TDCJ unit. Later, the TDCJ's expert, Dr. Thomas Allen, administered a different form of the WAIS test and reported that Eldridge scored a full-scale IQ of 84. Only Eldridge's full-scale IQ score of 72, on a test administered by his expert witness, Dr. Patricia Averill, placed him in the mildly mentally retarded range—and then only if Eldridge showed significant deficits in adaptive behavior.[18] Although Dr. Averill concluded that Eldridge was mentally retarded, the district court found Dr. Averill's analysis and conclusions to be unreliable because she failed to consider or test for the possibility of malingering or lack of effort, failed to consider explanations or possibilities other than mental retardation for the test results she obtained, and relied only on limited information about Eldridge's background. Further, before testing Eldridge, Dr. Averill reviewed no school or work records, prior IQ scores, or psychological evaluations and did not interview Eldridge's family and friends.

In *Woods v. Quarterman*, we held that a state court's conclusion that the petitioner failed to demonstrate that he suffered from subaverage general intellectual functioning was not unreasonable.[19] In *Woods*, the petitioner's expert was the "only person to test Woods' IQ below seventy" and did so on a test

---

[18] *See* AMERICAN PSYCHIATRIC ASSOCIATION DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41-42 (Text Revision, 4th ed. 2000) (DSM-IV) ("Thus, it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior. Conversely, Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning.").

[19] 493 F.3d 580, 586-87 (5th Cir. 2007).

when the petitioner "had an incentive to perform poorly."[20] Petitioner's four other IQ test scores were above seventy points.[21] We concluded that the state habeas court's decision to give more weight to the petitioner's childhood IQ test scores than the score obtained by the petitioner's expert was reasonable because the latest result could have been caused by a motivation to score poorly.[22]

Further, in *Moore v. Quarterman*, we held that a state court's decision that a defendant was not mentally disabled "was not contrary to or otherwise involved an unreasonable application of clearly established federal law" even though the defendant presented evidence of full-scale IQ scores of 68, 72, 72, 76, 63, and 76.[23] There, "some expert opinion supported a finding of subaverage intellectual functioning, [but] there was other expert evidence indicating that Moore did not suffer from such functioning and that he underperformed on at least some of the tests."[24]

Similar to *Briseno*, in this case, Eldridge did not record an IQ score lower than 72, and all other scores were higher than 75. Additionally, as in *Woods*, the district court did not find Eldridge's full-scale IQ score of 72 to be reliable, partly because Eldridge had a motivation to score poorly. Finally, similar to *Moore*, Dr. Allen concluded that Eldridge was not mentally retarded and deliberately exerted no effort on the most recent IQ tests.[25]

---

[20] *Id.* at 586.

[21] *Id.*

[22] *Id.* at 587.

[23] 517 F.3d 781, 784 (5th Cir. 2008).

[24] *Id.*

[25] *See id.*

The district court found that Eldridge did not possess substantially subaverage intelligence. Based on the evidence, reasonable jurists would not disagree that this finding was not clearly erroneous.

## V

The district court also examined Eldridge's claimed deficits in adaptive functioning and determined that the evidence did not show a significant deficit consistent with mental retardation.

## A

The district court's finding that Eldridge was not deficient in academic functioning is not clearly erroneous. Eldridge's grades in high school, seventieth percentile graduation ranking, and the fact that he passed the pipe-fitters exam all support the district court's finding that Eldridge was not deficient in academic functioning. Further, Eldridge's conduct in prison, letters, and oral comments made during trial lend support to the district court's finding.

Eldridge argues that the district court failed to weigh properly Dr. Averill's testimony and that reasonable jurists could disagree as to whether Dr. Averill considered evidence showing that Eldridge was capable of more academic work than her testimony indicated. But the district court found Dr. Averill to be not credible because she dismissed evidence without an adequate basis for doing so. For example, Dr. Averill claimed that Eldridge received help writing his letters and a grievance with the State Bar of Texas but cited no evidence that this actually occurred. The district court stated, "[i]n short, Dr. Averill was either unaware of, or discounted, evidence that was inconsistent with the conclusions she had reached."

Eldridge also claims that he did not pass the pipe-fitters exam by himself, but that his brother, Barry Eldridge, took the test for him. However, the training coordinator for the pipe-fitters union testified that the test was taken in a locked room and that Barry did not have a key to get in. Additionally,

8

Barry's scratch paper from his own attempt to join the union and that of Eldridge's tests showed stark differences in problem-solving techniques. Finally, a handwriting analyst and certified fraud examiner testified that Eldridge's and Barry's tests were not written by the same person, and that it was highly probable that all of Eldridge's pipe-fitters exams were written by Eldridge.

Eldridge also argues that greater weight should have been given to the testimony of his mother, Mattie Wade, Barry Eldridge, and one of Eldridge's teachers at Jack Yates High School, Judith Zinsser.

According to Eldridge, Mattie Wade testified that she took librium before giving birth to him and that he did poorly in elementary school. But the district court noted these facts in its opinion and observed that the school did not require Eldridge to repeat a grade. Additionally, the district court noted that Donna Lawson, one of Eldridge's elementary-school teachers, used Eldridge as a peer tutor for kindergartners when he was in third grade and that Lawson's testing of Eldridge in second grade did not indicate mental retardation.

Barry Eldridge testified that he helped Eldridge with his homework, even when Eldridge was a year ahead of Barry in high school. This testimony was refuted, however, by an interview with Wan-Ling Woodbury, Eldridge's high-school algebra teacher. In that class, Woodbury required her students to work out math problems on the blackboard, and "Eldridge was not assisted by his brother Barry or a friend in working out such problems in the classroom." Woodbury stated that Eldridge could not be mentally retarded and perform as well as he did in the algebra class.

Finally, Eldridge claims that reasonable jurors could disagree on the weight to give Zinsser's testimony that Jack Yates High School was a low performing school and that students' grades were not necessarily valid. Zinsser also testified that Eldridge tested in the bottom one percent in the twelfth grade in reading. But the district court noted that, even taking into account the low

performance of Jack Yates High School, it would be difficult for a mentally retarded person to graduate in the seventieth percentile of his high-school class.

The district court found that Eldridge did not suffer a deficit in academic functioning. Reasonable jurists would not disagree that this finding was not clearly erroneous.

**B**

The district court's finding that Eldridge was not deficient in the area of work also was not clearly erroneous. Eldridge was regularly employed, received good performance reviews, worked over forty hours per week at times, received regular pay raises and, at one point, earned about four times the minimum wage.

Eldridge's primary argument is based on Dr. Averill's testimony that Barry Eldridge helped the petitioner take the pipe-fitters exam. However, the district court properly found that the credible evidence showed that Eldridge took the exam on his own and was successful in the pipe-fitters apprenticeship program. Therefore, reasonable jurists would not disagree that the district court's finding was not clearly erroneous.

**C**

The district court's finding that Eldridge did not have an adaptive deficit in social functioning was not clearly erroneous. Eldridge had friends during his school years, although not many, and evidence showed that Eldridge was socially confident in school until his knee injury. Eldridge had girlfriends in high school and subsequently had relationships with other women, including a common-law wife. Eldridge left socially appropriate messages on Cynthia Bogany's answering machine and, since being in prison, Eldridge has had "pen pals" from around the world with whom he corresponds, interactions that Dr. Allen concluded were inconsistent with mental retardation.

Eldridge argues that reasonable jurists could disagree as to the accuracy of some of Dr. Allen's statements, such as the finding that the messages on the answering machine were socially appropriate. Eldridge also argues that the court should have given more weight to Barry Eldridge's testimony and less to that of Hubert Hardeman. Because this court defers to the district court's credibility determinations,[26] reasonable jurists would not disagree that the district court's finding that Eldridge did not suffer a deficit in social functioning was not clearly erroneous.

## D

The district court further found that Eldridge was not deficient in the area of home life. Evidence showed that Eldridge cashed his paychecks, shared expenses when he lived with girlfriends, shopped for groceries, and performed some household chores. He had a job as a pipe-fitter's helper and he had a bank account. He drove and knew how to repair cars.

Eldridge claims that reasonable jurists could disagree that he had a deficit in home living because of the testimony of Dr. Averill. But the district court found that Dr. Averill's conclusions were based on assumptions not supported by the evidence.

Eldridge also argues that the district court improperly weighed much of Barry Eldridge's testimony. According to Eldridge, Barry indicated that Eldridge could not live by himself or take care of routine chores at home. Cynthia Bogany's niece refuted this testimony when she stated that Eldridge cooked for the family and made other contributions to home life.

---

[26] *See Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."); *Pippin v. Dretke*, 434 F.3d 782, 792 (5th Cir. 2005) ("A trial court's credibility determinations made on the basis of conflicting evidence are entitled to a strong presumption of correctness and are 'virtually unreviewable' by the federal courts." (quoting *Moore v. Johnson*, 194 F.3d 586, 605 (5th Cir.1999))).

Eldridge further argues that the district court gave too much weight to Barry Eldridge's testimony that his brother was not mentally retarded. But one of the evidentiary factors fact-finders might focus upon is whether "those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—[thought] he was mentally retarded . . . ."[27] Therefore, it was not improper for the district court to give Barry Eldridge's statement weight.

Finally, Eldridge argues that the district court improperly weighed Mattie Wade's testimony that he could not buy groceries "with a long list" and that Eldridge was forbidden from using the microwave after burning some bread. In light of other evidence, however, reasonable jurists would not disagree that the district court's finding that Eldridge did not suffer a deficit in the area of home living was not clearly erroneous.

## VI

The district court concluded that "[t]he evidence shows that Eldridge does not have significantly subaverage intellectual functioning or significant deficits in adaptive functioning. It necessarily follows that such symptoms did not manifest before Eldridge turned 18 years old." Eldridge's standardized tests and academic performance support such a conclusion. In the second grade, Eldridge tested in the forty-sixth percentile on the Peabody Picture Vocabulary Test (PPVT), which is within "normal" range. According to the PPVT, Eldridge's mental age was one month behind his chronological age. Additionally, as noted earlier, Eldridge was a peer tutor for kindergartners when he was in the third grade. Further, Eldridge was not in special-education classes, was not held back to repeat a grade, and graduated from high school in the seventieth percentile of his class. Finally, none of his friends or family, nor any medical professional,

---

[27] *Ex parte Briseno*, 135 S.W.3d 1, 8 (Tex. Crim. App. 2004).

gave any indication before Eldridge turned eighteen that they believed Eldridge was mentally retarded.[28]

The evidence in the record does not support Eldridge's contention that his alleged mental retardation had an onset before age eighteen. Accordingly, reasonable jurists would not disagree that the district court's finding that Eldridge's alleged mental retardation did not manifest before age eighteen was not clearly erroneous.

*   *   *

Because reasonable jurists would not find the district court's assessment of the constitutional claims debatable or wrong, Eldridge's request for a COA is DENIED.

---

[28] *See id.* at 17 ("It is highly significant that in none of these voluminous records is there any indication from any source that any person thought applicant might be mentally retarded.").