# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-70023

GERALD CORNELIUS ELDRIDGE,

Petitioner—Appellant

v.

WILLIAM STEPHENS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent—Appellee

United States Court of Appeals
Fifth Circuit

**FILED**

January 16, 2015

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:05-CV-1847

Before STEWART, Chief Judge, and OWEN and SOUTHWICK, Circuit Judges.

PER CURIAM:*

Gerald Cornelius Eldridge seeks a certificate of appealability (COA) on the issue of his competence to be executed under *Ford v. Wainwright*[1] and *Panetti v. Quarterman*.[2]  We deny his request for a COA.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] 477 U.S. 399 (1986).

[2] 551 U.S. 930 (2007).

No. 13-70023

**I**

In 1994, Eldridge was convicted of murdering his former girlfriend Cynthia Bogany, and her daughter Chirissa, and was sentenced to death.[3] As we previously recounted:

> The evidence established that Eldridge went to Cynthia Bogany's apartment, kicked in the door, and shot Chirissa between the eyes at point-blank range, killing her instantly. Eldridge then shot at close range his son Terrell and another individual, Wayne Dotson, both of whom were wounded but survived. Cynthia fled the apartment but Eldridge chased and caught her when she tripped and fell on the stairs outside a neighbor's apartment. Despite Cynthia's pleas for her life, Eldridge shot her twice in the head, killing her instantly. Eldridge was twenty-eight years old at the time of the murders.[4]

Eldridge's first habeas corpus petition was pending in the Texas state courts when the Supreme Court decided *Atkins v. Virginia*.[5] He subsequently filed a second petition raising an *Atkins* claim; the Texas courts denied the first petition, and dismissed the second as an abuse of the writ.[6] Eldridge then filed a habeas petition in federal district court raising only his *Atkins* claim.[7] The district court determined Eldridge was not intellectually disabled to render his execution unconstitutional under *Atkins*,[8] and this court denied Eldridge's request for a COA.[9] Eldridge's execution was set for November 17, 2009.[10]

---

[3] R. at 1965.

[4] *Eldridge v. Quarterman*, 325 F. App'x 322, 323 (5th Cir. 2009).

[5] 536 U.S. 304 (2002).

[6] R. at 1965.

[7] R. at 1965-66.

[8] R. at 662-64.

[9] *Eldridge*, 325 F. App'x at 329.

[10] R. at 1966.

No. 13-70023

On August 19, 2009, Eldridge moved the state trial court to appoint a mental-health expert to conduct a preliminary evaluation of his competence to be executed.[11]  The state trial court appointed Dr. Mary Alice Conroy, who interviewed Eldridge for two hours and concluded that Eldridge appeared to suffer from a psychotic disorder.[12]  On September 17, 2009, the trial court then granted the State's motion to allow Dr. Mark S. Moeller evaluate Eldridge. Dr. Moeller concluded Eldridge was malingering (i.e., feigning mental illness) to avoid execution.[13]  Eldridge then requested funding for a comprehensive evaluation of his competency to be executed, and sought an evidentiary hearing.[14] The state trial court denied both requests.[15]  On November 16, 2009, the eve of Eldridge's execution, the Texas Court of Criminal Appeals affirmed the trial court.[16]  Eldridge then filed a habeas corpus petition in federal district court on the ground that he was incompetent to be executed.

The district court determined Eldridge had made a substantial showing of incompetency based on demonstrated bizarre behavior and delusional statements, corroborated by expert evidence, and that Eldridge was entitled to a fair hearing on his claim.[17]  The court further concluded that the state court's failure to grant Eldridge funding for a comprehensive evaluation or give him an opportunity to respond to the State's expert opinion did not adhere to the requirements of due process as articulated by the Supreme Court in *Panetti*,[18]

---

[11] R. at 1966.

[12] R. at 1966.

[13] R. at 1967.

[14] R. at 1967.

[15] R. at 1967.

[16] R. at 1967.

[17] R. at 955.

[18] 551 U.S. 930 (2007).

3

and therefore, the state court's finding of competency was not entitled to deference under the Anti-Terrorism and Effective Death Penalty Act (AEDPA).[19]   The district court stayed Eldridge's execution, granted him funding for expert assistance, and scheduled an evidentiary hearing.[20]

At the hearing, the district court heard from four mental health experts: Dr. Pradan A. Nathan, Eldridge's treating physician for two years prior to the hearing; Dr. Michael Roman, a clinical psychologist retained by Eldridge specifically for his habeas petition; Dr. Thomas Allen, a psychiatrist retained by the State; and Dr. Moeller, the forensic psychologist who testified in the state habeas proceedings, also retained by the State.[21]   The court found that Dr. Roman's testimony was neither reliable nor credible, and that Dr. Nathan's testimony, while credible, was limited in probative value because most of his contact with Eldridge was via videoconference, and because Dr. Nathan had not specifically tested for malingering.[22]   In contrast, the court noted that the State's experts both had considerably more forensic experience than Dr. Roman and were credible witnesses.[23]

In determining that Eldridge was competent, the district court first noted that a number of mental health professionals had raised questions about Eldridge's credibility and found that he was feigning symptoms, and that other courts had rejected his claims of mental retardation based on findings that his claimed cognitive and intellectual limits were not credible or accurate.[24]   The

---

[19] R. at 956; *see* 28 U.S.C. § 2254(d).

[20] R. at 958, 964.

[21] R. at 1968-69, 1972, 1982, 1984, 2835, 2954.

[22] R. at 1992-93.

[23] R. at 1993-94.

[24] R. at 1992.

court then concluded that, although there was some evidence that Eldridge is mentally ill:

> [The State] was able to marshal far more evidence in support of [its] position that Eldridge has a far greater understanding of the reality he faces than Eldridge admits or describes . . . includ[ing] years of inconsistencies in the symptoms Eldridge described and the behavior he exhibited; years of mental health professional assessments; test results showing malingering; and Dr. Allen's own observations of the numerous and substantial inconsistencies between Eldridge's claimed symptoms and his behavior.[25]

The court noted that Dr. Moeller had also "presented compelling evidence that Eldridge is malingering, noting the atypical presentation of Eldridge's symptoms."[26]

The district court considered sua sponte whether Eldridge was entitled to a COA.[27] Because it determined that the evidence did not support his claim, the court concluded that Eldridge had failed to make a substantial showing of the denial of a constitutional right and denied a COA.[28] Eldridge now seeks a COA from this court to appeal the district court's judgment that he is competent to be executed.

## II

To obtain a COA under 28 U.S.C. § 2253(c), a petitioner "must make 'a substantial showing of the denial of a constitutional right' by demonstrating that 'reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'"[29] This is a threshold inquiry that

---

[25] R. at 1994.

[26] R. at 1994.

[27] R. at 1999.

[28] R. at 1999.

[29] *Hearn v. Thaler*, 669 F.3d 265, 271 (5th Cir. 2012) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

"does not require full consideration of the factual or legal bases adduced in support of the claims."[30]  In a death penalty case, "any doubts as to whether a COA should issue must be resolved in the petitioner's favor."[31]

"In a habeas corpus appeal, we review the district court's findings of fact for clear error and review its conclusions of law de novo; applying the same standard of review to the state court's decision as the district court."[32]  A prisoner's competency to be executed is a factual determination, and a state habeas court's factual finding is usually entitled to deference under § 2254(e)(1).[33]  In this case, however, the district court determined that the state court, when it found Eldridge competent to be executed, denied Eldridge due process because it refused to grant him funding for a comprehensive psychiatric evaluation after Eldridge made a substantial showing of his incompetency.[34]  The district court thus correctly did not afford the state court any deference when making its own determination of Eldridge's competence.[35]  Therefore, we now review for clear error the district court's finding that

---

[30] *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).

[31] *Blue v. Thaler*, 665 F.3d 647, 653 (5th Cir. 2011) (citation and internal quotation marks omitted).

[32] *Thompson v. Cain*, 161 F.3d 802, 805 (5th Cir. 1998).

[33] *Patterson v. Dretke*, 370 F.3d 480, 484 (5th Cir. 2004).

[34] R. at 956; *see Panetti v. Quarterman*, 551 U.S. 930, 949 (2007) ("Once a prisoner seeking a stay of execution has made 'a substantial threshold showing of insanity,' the protection afforded by procedural due process includes a 'fair hearing' in accord with fundamental fairness." (quoting *Ford v. Wainwright*, 477 U.S. 399, 424, 426 (1986) (Powell, J., concurring))).

[35] R. at 956 ("[T]he state court findings are not entitled to deference under AEDPA."); R. at 1963-2000 (evaluating Eldridge's competency with no deference to state court determinations); *see Panetti*, 551 U.S. at 948 (holding that no deference was owed when the "state court's failure to provide the procedures mandated by *Ford* constituted an unreasonable application of clearly established law").

Eldridge is competent to be executed.[36]  "A finding is clearly erroneous only if it is implausible in light of the record considered as a whole."[37]

In sum, a COA should issue for Eldridge if reasonable jurists could debate whether the district court did not clearly err when it found Eldridge competent to be executed.

### III

The Eighth Amendment's prohibition on cruel and unusual punishment prohibits the execution of a prisoner who is incompetent.[38]  The Supreme Court has declined to set forth a specific standard for determining a prisoner's competency to be put to death; however, it has noted that "[g]ross delusions stemming from a severe mental disorder may put an awareness of a link between the crime and its punishment in a context so far removed from reality that the punishment can serve no proper purpose."[39]  This court has previously discussed with approval a standard that seeks to determine whether the prisoner has a rational understanding of his crime, his impending death, and the causal relationship between the two.[40]  The district court articulated this standard in its order, explaining that "[t]he critical issue is whether Eldridge has a present rational understanding of the fact of his crime, of his death sentence, and of the connection between his crime and his death sentence."[41]

---

[36] *Thompson*, 161 F.3d at 805; *see also Panetti v. Stephens* 727 F.3d 398, 409-10 (5th Cir. 2013) (reviewing the district court's competence standard de novo while reviewing the district court's "ultimate finding of competency" for clear error).

[37] *St. Aubin v. Quarterman*, 470 F.3d 1096, 1101 (5th Cir. 2006).

[38] *Ford v. Wainwright*, 477 U.S. 399, 409-10 (1986).

[39] *See Panetti*, 551 U.S. at 960-61 ("[W]e do not attempt to set down a rule governing all competency determinations.").

[40] *Panetti*, 727 F.3d at 409-10.

[41] R. at 1991-92.

No. 13-70023

In concluding that Eldridge had a rational understanding of those facts and was therefore competent to be executed, the district court found that although Eldridge had presented evidence of mental illness, there was extensive evidence inconsistent with his claim of incompetence, particularly in regard to malingering and feigning symptoms.[42]  We now consider Eldridge's challenges to the district court's findings.

**A**

Eldridge first argues that the district court failed to give sufficient weight to the evidence that his symptoms had been documented at length by mental health professionals at the Texas Department of Criminal Justice (TDCJ) without any suggestion that they might be feigned, and that he has been prescribed powerful antipsychotic medications since 2009.[43]  This argument fails because the district court explicitly considered Eldridge's mental-health history—indeed, it found that "Eldridge has presented evidence supporting his claim that he is mentally ill."[44]  It simply determined that the veracity of this evidence was called into question by "the inconsistency of his symptoms, the self-serving nature of his complaints, past findings of malingering by [the] court and suspicions of malingering by treating professionals and expert witnesses."[45]

Eldridge takes issue with the district court's reliance on his past history of malingering, which he claims constitutes an improper assumption that he is necessarily feigning his present symptoms.  However, the district court's reliance on Eldridge's past history of malingering was only one of a number of

---

[42] R. at 1992.

[43] Eldridge Br. at 31-32.

[44] R. at 1992.

[45] R. at 1998.

facts that it appropriately considered as probative, but not dispositive, evidence of malingering.[46]  Eldridge does not argue that his past history of malingering has *no* evidentiary value, and thus his assertion that the district court improperly relied on it fails.  Reasonable jurists could not debate that the district court did not clearly err in its weighing of this evidence.

## B

The district court found that Dr. Nathan's conclusion that Eldridge's symptoms were genuine did not support a finding that he was incompetent to be executed because Dr. Nathan had conducted his evaluations of Eldridge via videoconference and had not specifically tested for malingering.[47]  Eldridge asserts that the district court erred in discounting Dr. Nathan's assessment because Dr. Nathan is a trained psychiatrist with nearly thirty years of forensic psychiatric experience, and he was constantly looking for signs of malingering.[48]  Eldridge also points to the fact that Dr. Nathan identified specific reasons for believing Eldridge suffers from genuine mental illness, such as his demonstrated looseness of association, his tendency not to call attention to his symptoms, and the waxing and waning pattern of his symptoms.[49]

As Dr. Nathan testified, however, he saw Eldridge in a clinical, rather than forensic, capacity.[50]  Although he considered generally the possibility that Eldridge was malingering, as he does for all inmates, he admitted that seeing Eldridge via videoconference was not ideal for a forensic assessment.  He also conceded that it would be easier to feign symptoms, such as looseness of

---

[46] R. at 1998.

[47] R. at 1992.

[48] Eldridge Br. at 34-35.

[49] Eldridge Br. at 36-39.

[50] R. at 2836.

association, in a treatment environment, in which patients are seen for shorter periods of time, than during a forensic evaluation.[51]   Further, as the district court noted in its analysis, Dr. Nathan stated that had he known that ten mental health experts between 1993 and 2009 had found Eldridge was feigning symptoms, he would have made a more substantial effort to ascertain whether Eldridge was malingering.[52]   Reasonable jurists could not debate that the district court's determination that Dr. Nathan's opinion lacked sufficient probative value to support a determination of incompetence was not clearly erroneous.

## C

Eldridge next challenges the district court's determination that Dr. Roman was "neither reliable nor credible."[53]  Eldridge asserts the district court improperly relied on Dr. Allen's testimony that Dr. Roman misrepresented evaluations given to Eldridge because the record indicates Dr. Allen actually mischaracterized Eldridge's evaluations.[54]  He also takes issue with the district court's statement that Dr. Roman conceded violating ethical standards when he allowed Eldridge's counsel in the interview room during his first meeting with Eldridge.[55]

But even assuming, arguendo, that Eldridge is correct on both points, it does not follow that the district court's determination that Dr. Roman's testimony was neither reliable nor credible was in error.  The district court's adverse credibility determination of Dr. Roman was premised in large part on Dr. Roman's inadequate responses to the "numerous red flags indicating

---

[51] R. at 2836, 2947-48.

[52] R. at 1972, 2899-902, 2951.

[53] R. at 1993.

[54] Eldridge Br. at 41-43.

[55] Eldridge Br. at 43-45.

malingering throughout Eldridge's record."[56]  Specifically, the district court found that Dr. Roman ignored contrary evidence or dismissed it with unpersuasive explanations, and selectively emphasized evidence favoring his determination that Eldridge was incompetent.[57]

Eldridge argues that Dr. Roman acknowledged the contrary evidence and did not ignore it.  However, this does not address the district court's concern that Dr. Roman responded to this evidence by deemphasizing it or providing unsatisfactory explanations as to why it did not indicate malingering.  Additionally, the district court noted that Dr. Roman had conducted only one previous capital competency evaluation and had been found to be not credible by the district court in that case.[58]  Thus, it was Dr. Roman's inadequate testimony, inexperience, and past performance record that led the district court to find him not to be credible.  Reasonable jurists could not debate that the district court did not clearly err in finding Dr. Roman to not be a credible expert witness.

## D

Eldridge next argues that the district court relied on scientifically flawed assertions by Dr. Allen and Dr. Moeller when finding Eldridge competent to be executed.  However, there is nothing in the record to which Eldridge can point that could render infirm the district court's findings.

Eldridge first argues that Dr. Moeller's testimony that schizophrenia is a progressive, degenerative disease is inaccurate, as was his conclusion that

---

[56] R. at 1993.

[57] R. at 1993.

[58] R. at 1993; *see also Wood v. Thaler*, 787 F. Supp. 2d 458, 499 (W.D. Tex. 2011) ("This Court finds incredible the conclusions and diagnosis of Dr. Michael A. Roman . . . .  Dr. Roman's diagnosis is simply unworthy of belief.").

the absence of increasingly severe symptoms is indicative of malingering.[59] But the district court did not actually rely on this testimony in its analysis. Although the district court noted Dr. Moeller's testimony on the progression of schizophrenia, the district court's analysis focused on the inconsistency of Eldridge's symptoms over time, his mental health history, his test results indicating malingering, observed contradictions between Eldridge's reported symptoms and his behavior, and the atypical presentation of his symptoms.[60] Notably, Eldridge does not contest the legitimacy of Dr. Moeller's testimony regarding the atypical presentation of Eldridge's symptoms—namely, that the fluctuations from symptomatic to non-symptomatic were too extensive, frequent, and severe to be explained by ordinary waxing and waning—which the district court found to be "compelling evidence that Eldridge is malingering."[61]

Next, Eldridge contends the district court accepted Dr. Allen's erroneous assertion that genuine symptoms of psychosis are not self-serving.[62] While Dr. Allen repeatedly asserted that genuine delusions generally get people "in trouble, not out of it," he stopped short of stating that self-serving reports of symptoms and genuine symptoms are mutually exclusive.[63] Instead, he explained that if delusions are self-serving, especially when they lead to an avoidance of criminal responsibility, there is reason to question their veracity.[64] In relying on Dr. Allen's testimony, the district court was concerned

---

[59] Eldridge Br. at 45-46.

[60] R. at 1994.

[61] R. at 1983, 1994.

[62] Eldridge Br. at 47.

[63] R. at 3642-47.

[64] R. at 3646-47.

with both the self-serving nature of Eldridge's symptoms and the timing of their presentation, occurring only after his arrest.[65]

Eldridge also finds fault in the district court's endorsement of Dr. Allen's testimony regarding a link between Eldridge's antisocial personality disorder (ASPD) and malingering.[66] But this cannot be the basis for finding error in the district court's order because it did not rely on this testimony when finding Eldridge was malingering. The district court repeated Dr. Allen's testimony in its order and tacitly endorsed it as a reason for discrediting Dr. Roman, noting that "Dr. Allen was also sharply critical of Dr. Roman's failure to consider antisocial personality disorder and the relationship of this disorder to malingering."[67] But the district court did not mention ASPD in its analysis as being among the numerous reasons for concluding that Eldridge is malingering.[68]

Eldridge asserts the district court erred by accepting Dr. Allen's and Dr. Moeller's testimonies that Eldridge's claimed delusions were not credible because he did not exhibit behaviors consistent with his delusions, and by discrediting Dr. Roman's double-bookkeeping theory of schizophrenia, which would have provided an explanation for the inconsistencies.[69] Dr. Roman testified that under the double-bookkeeping theory, a person exists in two separate realities, a condition in which inconsistencies in delusions and behaviors would be expected and not an indication of malingering.[70] Eldridge

---

[65] *See* R. at 1997 (finding that another capital inmate's claim of incompetency was significantly more compelling, in part because he "had a long documented history of mental illness that predated his crime; Eldridge does not").

[66] Eldridge Br. at 46-47.

[67] R. at 1989-1990.

[68] R. at 1991-95.

[69] R. at 1993-94; Eldridge Br. 49-51.

[70] R. at 2998-99.

points to a 1950 article that endorsed the double-bookkeeping theory that was written by, as Dr. Allen admitted, a physician whose insights are still respected and useful in the study of schizophrenia.[71]  However, Dr. Moeller testified that he reviewed the literature on double bookkeeping and concluded the theory "just doesn't hold water."[72]  Dr. Moeller testified that there is "no scientific basis on how [the double-bookkeeping theory] works or if it is volitional or not volitional."[73]  Dr. Allen also pointed out that the article Eldridge cites was not peer-reviewed.[74]  Furthermore, the fact that the author of the theory has other still respected and useful insights on schizophrenia does not necessarily mean that *all* of his theories continue to be so highly regarded.

The purported scientific errors alleged by Eldridge are thus not sufficient such that reasonable jurists could debate that the district court did not clearly err when weighing the scientific conclusions of the expert witnesses.

**E**

Lastly, Eldridge asserts that the district court erred in finding that Eldridge is malingering and competent to be executed.  For one, Eldridge argues that the district court should not have found inconsistencies in his delusions and behaviors and points to a few examples of consistencies.[75]  But, reasonable jurists could not debate that the district court clearly erred by finding Eldridge competent to be executed because it relied on overwhelming evidence indicating Eldridge is malingering.

The district court's discussion of the expert witnesses' testimony supports its finding that Eldridge is malingering.  For example: Dr. Moeller

---

[71] R. at 3672; Eldridge Br. at 51.

[72] R. at 3483, 3494-95, 3512-13.

[73] R. at 3483.

[74] R at 3712-13.

[75] Eldridge Br. at 52.

14

testified that the fluctuations in Eldridge's symptoms were too severe to be natural waxing and waning, as Dr. Roman asserted. Waxing and waning of symptoms occurs gradually but Dr. Moeller's review of Eldridge's psychiatric history reveals rapid changes from symptomatic to non-symptomatic.[76] Dr. Moeller also testified that when shown crime-scene photographs of his victims, Eldridge responded emotionally, acknowledging that he must have committed the crime. But, as Dr. Moeller explained, if Eldridge genuinely suffered from schizophrenia and believed he did not commit the murders, he would have challenged the veracity of the photographs rather than accept his apparent culpability.[77]

Dr. Allen noted several oddities in the historical presentation of Eldridge's symptoms. As an example, Eldridge reported a combination of auditory, tactile and visual hallucinations; this combination, Dr. Allen testified, is inconsistent with genuine mental illness.[78] Dr. Allen also testified about Eldridge's results on the TOMM, SIMS, and M-FAST tests he administered; all three tests indicated a high probability Eldridge was feigning his symptoms.[79]

The district court was further persuaded by Dr. Roman's concessions regarding much of the evidence of malingering in Eldridge's psychiatric history. First, Dr. Roman stated that certain delusions Eldridge self-reported were "crazy stuff" inconsistent "with the way that mentally ill people

---

[76] R. at 1983, 3490-91.

[77] R. at 1983, 3484.

[78] R. at 1986, 3550 ("[Dr. Allen]: It would be really rare to have someone who is delusional and has inconsistent hallucinations and tactile hallucinations and the hallucinations include auditory and visual hallucinations. That just would be incredibly rare.").

[79] R. at 1987, 3570-72.

present."[80]  Dr. Roman also acknowledged that much of Eldridge's psychiatric history contained evidence of malingering, such as the absence of major mental-health complaints before the scheduling of his execution date in 2009.[81] Furthermore, Dr. Roman testified that many statements and behaviors exhibited by Eldridge during an examination by Dr. Moeller were more consistent with malingering than schizophrenia.[82]  Subsequently, as the district court noted, Dr. Roman conceded that Eldridge's ability to obtain cocaine in prison "would suggest a much better ability to navigate the social and physical environment and consider all sorts of things [than] we would typically apply to somebody with a severe psychotic disorder."[83]

Ultimately Dr. Moeller and Dr. Allen believed that Eldridge was malingering.  Although Dr. Nathan and Dr. Roman both concluded that Eldridge was not competent to be executed, Dr. Nathan did not test Eldridge for malingering[84] and Dr. Roman conceded much of Eldridge's psychiatric history provides evidence of malingering.  Thus, reasonable jurists could not debate that the district court did not clearly err when it found Eldridge competent to be executed.

\*     \*     \*

We therefore DENY Eldridge's application for a COA on the issue of his competence to be executed.

---

[80] R. at 3203.

[81] R. at 1979-80, 3257-58.

[82] R. at 1980, 3258-60.

[83] R. at 1981, 3331-32.

[84] R. at 1971-72.