# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 16-70010

United States Court of Appeals
Fifth Circuit

**FILED**

October 19, 2016

Lyle W. Cayce
Clerk

STEVEN LYNN LONG,

>       Petitioner - Appellant

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

>       Respondent - Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:12-CV-839

Before CLEMENT, ELROD, and SOUTHWICK, Circuit Judges.

PER CURIAM:*

The District Court denied Steven Long's habeas petition. Because the district court also denied his request for a Certificate of Appealability, Long has filed a motion here for that Certificate. The motion is DENIED.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 16-70010

## FACTUAL AND PROCEDURAL BACKGROUND

On May 20, 2005, eleven-year-old Kaitlyn Smith spent the night with her neighbor. Kaitlyn was reported missing the next morning. A search of the neighborhood ensued. During the search, Kaitlyn's grandfather found her body beneath a vacant home after he noticed the skirting around the home had been disturbed. Police found a bloody fingerprint near Kaitlyn's body. It was matched to Steven Long, who had been staying at the neighbor's house. Later that night, Long confessed to killing Kaitlyn. Kaitlyn's autopsy revealed defensive abrasions and evidence of a prolonged and violent sexual assault. Long was tried and convicted in state court in Dallas County, Texas.

Both the prosecution and the defense presented extensive evidence during the penalty phase. The prosecution detailed Long's history of violence and sexual deviance. As a teenager, Long was arrested three times and identified as having homicidal tendencies. He once participated in a drive-by shooting. During his various terms of incarceration, Long exhibited lascivious behavior and violated several prison rules. Outside of prison, Long was unable to maintain relationships, often abusing the women he dated. His abusive tendencies continued even as he was awaiting trial for Kaitlyn's murder.

Long's mitigation evidence primarily concerned his atypical upbringing and family background. His mother, Judy, testified she often neglected her children — she would at times "go out to bars, take the children, and leave them sitting in the car." Judy gave her children alcohol at a young age and threatened to leave them at an orphanage when they misbehaved. As a result, Long's sister was his primary caregiver. His sister moved out of the house as a teenager, leaving Long alone. As a child, Long was arrested several times, suffered anxiety attacks, and misbehaved at school. His behavior only worsened as he got older. Long once threatened his mother with a knife and physically assaulted his daughter. Additionally, Long was sexually abused by

2

a fellow inmate during one of his terms in prison.  One expert opined that this assault led Long to sexualize violence.   After hearing all the evidence, the jury sentenced Long to death.  The Texas Court of Criminal Appeals affirmed.  *Long v. State*, No. AP-75539, 2009 WL 960598 (Tex. Crim. App. Apr. 8, 2009).

Long then filed a state habeas petition challenging the validity of his conviction and sentence.  The parties presented evidence on the issue of Long's intellectual capacity, focusing mainly on whether he had malingered on his intelligence tests to skew the results.  Dr. Daneen Milam testified on Long's behalf after administering several tests, including the Wechsler Adult Intelligence Scale to measure intelligence and the Holstead-Reitan Battery to determine whether Long had suffered brain damage.  Dr. Milam determined Long had no brain damage but did have an IQ in the low 60s, which she considered accurate based on consistency in Long's reported IQ scores from previous tests.  On cross-examination, Dr. Milam conceded Long could have put forth sub-optimal effort on her tests, which would result in a poor score.  She had not tested Long to determine whether he was malingering.  She also conceded Long did not score poorly on IQ tests until after he had been charged with a capital offense.

Toni Knox, a mitigation specialist, also testified on Long's behalf.  Knox acknowledged that most of her professional work focused on eliminating the death penalty.  Even so, her testimony was largely unfavorable to Long's defense.  She testified Long was manipulative and had never been diagnosed as intellectually disabled.  She also acknowledged that each of the mental health professionals retained for trial believed Long had malingered on his intelligence tests to skew the results.

Finally, Long called Dr. Laura Lacritz to testify concerning the tests she performed on him prior to trial.  Like those administered by Dr. Milam, the tests revealed Long had an IQ of 62, but Dr. Lacritz was concerned those

results did not reflect the full measure of Long's intellectual capacity. In fact, Dr. Lacritz identified Long's conversational style and his ability to play chess and perform mathematical functions as reasons to doubt that Long was intellectually disabled.

In addition, the state had three primary witnesses. Dr. Randall Price indicated Long was not intellectually disabled for several reasons. First, Long took the California Achievement Test at seven years old, which indicated his IQ was 91. During his meetings with Dr. Price, Long reported not remembering the details of his crime, despite offering a thorough confession to police. Dr. Price believed Long's attempt at exculpating himself was "a sign of some kind of intellectual abstract thinking." Also, Dr. Price testified Long read novels, applied for credit, purchased a car, and worked multiple jobs, all of which indicated a measure of intellectual function. Finally, Dr. Price noted no one in Long's family believed him to be intellectually disabled.

Dr. Kelly Goodness, having been retained by Long's trial attorneys, also testified at the state habeas proceedings. Based on her interaction with Long, Dr. Goodness did not believe Long to be intellectually disabled. She believed his IQ was likely in the mid-80s. Dr. Goodness attributed Long's adaptive deficiencies to personality faults and drug abuse instead of intellectual disability. Finally, Paul Johnson (Long's trial attorney) testified he made every attempt to unearth evidence before trial concerning circumstances that might mitigate Long's penalty. The three experts he retained all believed Long to be malingering on the intelligence tests.

After the multi-day evidentiary hearing, the state trial court recommended denial of the petition. The Court of Criminal Appeals adopted a majority of the recommended findings and denied relief. *Ex parte Long*, No. WR-76324-01, 2012 WL 752547, at *1 (Tex. Crim. App. Mar. 7, 2012). Long then filed a federal habeas petition in the Northern District of Texas. There,

No. 16-70010

he presented seven grounds for relief, including intellectual disability. After the presentation of evidence, Long requested a six-month continuance so he could be retested to determine whether he had malingered on the intelligence tests. The district court denied a continuance, any relief, and a Certificate of Appealability ("COA"). Here, Long seeks a COA on the issue of intellectual disability under *Atkins v. Virginia*, 536 U.S. 304 (2002).

## DISCUSSION

To appeal the district court's denial of his habeas petition, Long must first obtain a COA. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). A COA may be granted "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). If "a district court has rejected the constitutional claims on the merits," as occurred here, a "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The issue is the "debatability of the underlying constitutional claim, not the resolution of that debate." *Miller-El*, 537 U.S. at 342. "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims"; instead, it involves "an overview of the claims in the habeas petition and a general assessment of their merits." *Id.* at 336.

"In death penalty cases, any doubts as to whether the COA should issue are resolved in favor of the petitioner." *Moore v. Quarterman*, 534 F.3d 454, 460 (5th Cir. 2008). In considering a COA on a claim denied on the merits by a state court, we are controlled by 28 U.S.C. § 2254(d). That statute "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (quotation marks omitted). A federal court may not

grant habeas relief under Section 2254(d) unless the state court decision "was contrary to federal law then clearly established" by the Supreme Court; "involved an unreasonable application of" clearly established Supreme Court precedent; or "was based on an unreasonable determination of the facts in light of the record before the state court." *Harrington v. Richter*, 562 U.S. 86, 100 (2011) (citations and quotation marks omitted).

A state court's decision is contrary to clearly established federal law if the Supreme Court has reached a different conclusion on a question of law or has decided a similar case the opposite way. *Higgins v. Cain*, 720 F.3d 255, 260 (5th Cir. 2013). A state court's application of federal law is unreasonable if the court identifies the correct legal principles but applies them unreasonably to the facts of the case before it. *Id.* "The state court's factual findings are presumed to be correct unless the habeas petitioner rebuts the presumption by clear and convincing evidence." *Id.* (quotation marks omitted).

Long argues the district court erred in these ways: (1) finding three experts evaluated Long for intellectual disability and determined he was not intellectually disabled; (2) concluding Long was malingering, despite the fact that several IQ tests revealed nearly the same results; and (3) denying Long's request for a continuance of the evidentiary hearing to allow another assessment of malingering.

### 1. Intellectual Disability Testing

The district court found the experts had, in fact, tested Long for intellectual disability and they agreed he did not satisfy the standard. In *Atkins*, the Supreme Court left "the task of developing appropriate ways to enforce the constitutional restriction upon [the] execution of sentences" to the states. 536 U.S. at 317. In Texas, *Atkins* intellectual disability "is a disability characterized by: (1) significantly subaverage general intellectual functioning;

6

No. 16-70010

(2) accompanied by related limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18." *Ex parte Briseno*, 135 S.W.3d 1, 7 (Tex. Crim. App. 2004) (quotation marks omitted). To succeed on an *Atkins* claim, a defendant must prove his intellectual disability by a preponderance of the evidence. *Lewis v. Quarterman*, 541 F.3d 280, 283 (5th Cir. 2008).

Satisfying each element of the *Briseno* test is necessary to a finding of intellectual disability in Texas. *Blue v. Thaler*, 665 F.3d 647, 662 (5th Cir. 2011). A determination as to whether any of the elements are satisfied is a question of fact. *Briseno*, 135 S.W.3d at 9. Both the state and the district court's findings of fact are reviewed for clear error. *Thompson v. Cain*, 161 F.3d 802, 805 (5th Cir. 1998). "A finding is clearly erroneous only if it is implausible in the light of the record considered as a whole." *St. Aubin v. Quarterman*, 470 F.3d 1096, 1101 (5th Cir. 2006).

Only the first element is at issue here. A "significantly subaverage general intellectual functioning [is] generally defined as an IQ below 70." *Eldridge v. Quarterman*, 325 F. App'x 322, 324 (5th Cir. 2009). Long's attorneys obtained the assistance of three mental health professionals — Drs. Goodness, Crowder, and Lacritz — before trial, who tested Long for intellectual disability. All agreed that Long is not intellectually disabled. Reasonable jurists would not debate those findings. *See Slack,* 529 U.S. at 484.

Long argues that no expert evaluated him for intellectual disability before trial. In Long's view, Dr. Goodness conducted no testing whatsoever, and Dr. Crowder was only retained to conduct sanity and competency testing. Long admits Dr. Lacritz administered an IQ test and found the results were invalid because of malingering. Thus, Long was evaluated for intellectual disability but failed to meet the first element of the *Briseno* test because of his malingering. We agree with the Government that "tested" should not be read in a hyper-technical sense. As long as at least one expert evaluated Long for

7

one of the intellectual disability criteria, the district court did not err because "fulfillment of each prong is necessary to a finding of" intellectual disability. *See Maldonado v. Thaler*, 625 F.3d 229, 241 (5th Cir. 2010).

We also note that Long did not show limitations in his adaptive functioning related to his intellectual ability. *See Ex parte Hearn,* 310 S.W.3d 424, 428 (Tex. Crim. App. 2010). True, Long demonstrated some adaptive deficiencies. For example, he struggled in school, never lived independently, and experienced difficulty in the workplace. Still, Long did not show that these adaptive deficiencies were related to his alleged intellectual disability as required by *Hearn*. Instead, the evidence suggested any adaptive behavior deficits were the result of drug use, behavioral problems, lack of motivation, and a dysfunctional family environment.

As to whether the experts agreed Long was not intellectually disabled, the state court record supports the district court's summation. Long's trial counsel testified that all of the experts told him they did not believe Long was intellectually disabled. Dr. Goodness and Dr. Lacritz confirmed their statements to that effect. Dr. Crowder did not testify, but two other witnesses indicated Dr. Crowder did not believe Long was intellectually disabled either. Based on our assessment of the evidence, reasonable jurists would agree that Long had been tested for intellectual disability before trial and that all mental health professionals agreed he was not intellectually disabled.

### 2. Malingering

The district court determined the state court acted reasonably in finding Long's IQ scores were within the range of intellectual disability due to his malingering. Long contends "the amazing consistency between [his] IQ scores . . . given by three different clinicians over a three-and-a-half-year period" is compelling evidence his low IQ scores are accurate. Long highlighted expert

testimony that his lifestyle before incarceration was consistent with the lifestyle of someone who was intellectually disabled. Long further asserts Dr. Milam testified he was intellectually disabled and not malingering.

A "state habeas court [is] permitted to discount [IQ] scores due to the incentive to malinger." *Taylor v. Quarterman*, 498 F.3d 306, 308 (5th Cir. 2007). Several experts agreed Long was giving less than full effort on the tests administered. The fact that some experts disagreed and the state habeas court chose to side with the majority opinion does not render the court's opinion unreasonable. *See Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). The opinions that Long was malingering were supported by evidence that he had not put forth effort in most areas of his life; that he was inconsistent in providing information about his crimes to police; and that he only scored below the intellectual disability threshold on tests after being charged with capital murder. Based on controlling law and the deferential standard of review, reasonable jurists would not consider this finding debatable.

### 3. *Continuance*

Finally, Long contends the district court erred by refusing to grant his request for a six-month continuance to undergo additional testing. Long's primary argument on this point is that "the question whether [he] was malingering when he took the IQ tests was the only contested issue," so the state court violated his due process rights by refusing to grant additional time.

In the *Atkins* context, petitioners are not guaranteed evidentiary hearings but merely "the opportunity to be heard." *Tercero v. Stephens*, 738 F.3d 141, 148 (5th Cir. 2013). In *Tercero*, the state court did not afford the petitioner an evidentiary hearing. *Id.* Instead, the court permitted him to file successive habeas applications and "did not limit the evidence he could attach to that pleading." *Id.* The state fully responded to each argument presented

in the petition. *Id.* The petitioner, therefore, had the power to define the boundaries of what the state court would consider; the court was not required to probe for additional arguments. *Id.* On appeal, we found "the state court provided [the petitioner] with a full opportunity to be heard." *Id.* No evidentiary hearing was necessary because the petitioner had previously developed his claims in full. *Id.* at 148–49.

As in *Tercero*, the state court here satisfied the dictates of procedural due process. Long was afforded a three-day evidentiary hearing during which several mental health professionals and his trial counsel testified as to the evidence of his intellectual disability. Nothing suggests the court limited its consideration of Long's *Atkins* claim. Instead, the record shows the court conducted an exhaustive review of the vast amount of evidence presented. Long still requested a six-month continuance during which additional testing could be done. Long, though, offered no evidence to indicate the testing might yield results different from those already obtained. In fact, he could not show with certainty his expert would even readminister the test, stating instead that she might "possibly" do so. As a result, Long cannot show the "substantial prejudice" necessary to establish a denial of procedural due process. *Davis v. Mann*, 882 F.2d 967, 975 (5th Cir. 1989).

The district court's decisions that Long was tested for intellectual disability, that he malingered on those tests, and that he was afforded adequate process are not debatable among jurists of reason. Long's request for a COA is DENIED.